2007 UT App 19

**Tim P. BENNETT; Dale R. Bennett; and Bennett and Economy Sanitation, Inc., Plaintiffs and Appellees,**

v.

**Grant S. HUISH and Utah Funding and Loan, Inc., Defendants and Appellants.**

**No. 20050499–CA.**

Court of Appeals of Utah.

Jan. 25, 2007.

Gerry B. Holman, Dunn & Dunn, Salt Lake City, for Appellants.

Chris L. Schmutz, Schmutz Mohlman & Rohbock, Bountiful, for Appellees.

Before Judges BILLINGS, McHUGH, and THORNE.

## OPINION

THORNE, Judge:

¶1 Defendants Grant S. Huish and Utah Funding and Loan, Inc. (Utah Funding) appeal the trial court's ruling that Defendants committed conversion of loan proceed funds and that Huish breached his fiduciary duty to Plaintiffs. Defendants also appeal the trial court's order awarding judgment, punitive damages, and prejudgment interest to Plaintiffs Tim P. Bennett; Dale R. Bennett; and Bennett and Economy Sanitation, Inc. We affirm.

## BACKGROUND

¶2 Plaintiffs Tim P. Bennett and Dale R. Bennett are brothers who operated Bennett and Economy Sanitation, Inc., a sanitation business. In 1999, they decided to expand their business to include a salvage operation. Plaintiffs located a lot on Beck Street to accommodate their business expansion and contacted Kary Austin, a mortgage broker, to acquire a $1.2 million loan for them. Aus-

tin learned that the lot was scheduled to be sold at a tax sale and began looking for a "hard money" loan until a conventional loan could be obtained. Austin contacted Huish, who had experience with hard money loans, to assist them in obtaining a lender for such a loan.

¶ 3 Huish located a lender, UTCO Associates, Ltd. (UTCO), and met with Plaintiffs and Austin at the closing to explain the terms of the loan. Huish informed Plaintiffs that the loan would be due in ninety days with late payment penalty fees of 10% of the principal balance and the normal rate at that time of 18% interest that would be accelerated to 36% upon default. Plaintiffs, while not finding the terms acceptable, decided to undertake the loan due to the pending tax sale and representations by Huish that he had a long-term replacement loan that could be closed within the next 30 to 45 days. Huish did not guarantee that there was such a loan, and Plaintiffs signed an affidavit of "no take-out commitment" which indicated that no replacement loan was guaranteed or committed by UTCO or any of its lenders. Plaintiffs entered into the loan agreement (the Beck Street Loan), brokered by Huish, with Robert Kent of UTCO for $1.2 million. The Beck Street Loan was secured by trust deeds on several properties owned by Plaintiffs.

¶ 4 Plaintiffs made timely interest payments but were unable to make the loan's balloon payment, requiring them to pay an extension fee of $18,000 to avoid default. Huish negotiated the extension fee,[1] and disbursed $12,000 of the fee to UTCO and the remaining $6000 to Utah Funding,[2] one of Huish's companies. Later, upon being advised by Huish to reduce the loan principal to attract a long-term lender, Plaintiffs mortgaged their homes, which reduced the loan by approximately $227,000. Plaintiffs also mortgaged another piece of property and wrote Utah Funding a check for $93,308. Huish kept $19,000 as an extension fee and paid $74,308 to UTCO.

¶ 5 On November 3, 2000, Plaintiffs entered into a loan with Waterpro, Inc. (the Waterpro Loan), brokered by Huish, for $70,000 to bring the Beck Street Loan current. Huish prepared a closing statement that directed the title company to disburse $27,995.98 to Utah Funding for "30 day Loan extension Beck Street," $13,977.99 to Synergetics[3] for "Interest payment Beck Street," and $20,674.92 to Plaintiffs. Of the $27,995.98 disbursed for the Beck Street Loan extension, approximately $9314 went to UTCO and $18,628 to Utah Funding.

¶ 6 In December the balloon payment on the Beck Street Loan again became due. Huish had still not obtained a long-term loan and Plaintiffs did not have the funds to make the payment. Thus, Huish informed Plaintiffs that a $50,000 rollover would be needed.[4] Thereafter, Plaintiffs filed for Chapter 11 protection, and requested that Huish return the $27,995.98 that they alleged he was holding for them to pay future extension fees for the Beck Street Loan. Huish refused to return the money and Plaintiffs filed a complaint against Defendants alleging breach of fiduciary duty, violation of express trust, imposition of constructive trust, conversion, and fraud, seeking return of the $27,955.98 plus attorney fees, costs, punitive damages, and prejudgment interest.

¶ 7 A bench trial was held on February 24, 2005. The trial court found that Huish had a duty to disclose that he was taking a commission from the extension fees, and that he violated his fiduciary duty by failing to disclose that he was taking a commission from the Waterpro Loan proceeds. Furthermore, the trial court found that Defendants converted those funds by refusing to return the

---

1. Huish testified that the fee was set in consultation with UTCO, but the trial court found that Huish set the fee unilaterally.

2. The trial court found that Huish did not inform Plaintiffs that he would retain any commission as part of the extension process. The trial court also found that Plaintiffs believed Huish was involved in obtaining a long-term loan and would receive a commission for those efforts.

3. Synergetics is an entity owned by or affiliated with UTCO.

4. Huish testified that Kent from UTCO instructed Huish to demand the $50,000 as an extension fee. However, the trial court found that it was Huish's decision to set the amount of the fee.

amount not used to further extend the Beck Street Loan. The trial court concluded Plaintiffs were entitled to judgment in the amount of $18,643.98, plus statutory interest and $50,000 in punitive damages.

## ISSUES AND STANDARDS OF REVIEW

■■■ ¶ 8 Defendants first argue that the trial court erred in admitting parol evidence regarding an oral agreement, contrary to the plain meaning of the closing statement, because the statement was an unambiguous integrated agreement. As matters of law, both the issues pertaining to ambiguity and admittance of parol evidence present questions of law which we review under a correctness standard, granting no particular deference to the trial court. *See Oliphant v. Estate of Brunetti*, 2002 UT App 375, ¶ 14, 64 P.3d 587 (addressing determinations of ambiguity); *Spears v. Warr*, 2002 UT 24, ¶ 18, 44 P.3d 742 (addressing admittance of parol evidence). In determining "whether [the parties] adopted a writing ... as a complete integration of their agreement, we incorporate a clearly erroneous standard of review." *Spears*, 2002 UT 24 at ¶ 18, 44 P.3d 742.

■■■ ¶ 9 Defendants next argue that the statute of frauds bars enforcement of the alleged oral agreement because they claim the agreement constituted an escrow agreement and pertained to a conveyance of land. "The applicability of the statute of frauds is a question of law to be reviewed for correctness." *Id.* at ¶ 23.

■■■ ¶ 10 Defendants also contend that the trial court erred in concluding that Defendants committed conversion and that Huish breached his fiduciary duty. "Whether the trial court properly applied the law of conversion is a legal question, which we review for correctness." *Fibro Trust, Inc. v. Brahman Fin., Inc.*, 1999 UT 13, ¶ 19, 974 P.2d 288. Whether a party breached a fiduciary duty is a mixed question of fact and law in which we grant the trial court ample discretion. *See C & Y Corp. v. General Biometrics, Inc.*, 896 P.2d 47, 53 (Utah Ct.App. 1995).

■■■ ¶ 11 Defendants further contend that the trial court erred in awarding punitive damages and prejudgment interest to Plaintiffs. "Whether punitive damages [should be] awarded is generally a question of fact within the sound discretion of the [fact finder], and will not be disturbed absent an abuse of discretion." *ProMax Dev. Corp. v. Mattson*, 943 P.2d 247, 259 (Utah Ct.App. 1997) (alterations in original) (quotations and citation omitted). "A trial court's decision to grant or deny prejudgment interest presents a question of law which we review for correctness." *Smith v. Fairfax Realty, Inc.*, 2003 UT 41, ¶ 16, 82 P.3d 1064 (quotations and citation omitted).

■■■ ¶ 12 Lastly, Defendants claim that the trial court erred in finding Huish personally liable for acts in the course and scope of his employment. "For a mixed question of law and fact, which requires a trial court to determine whether a given set of facts comes within the reach of a given rule of law, we [still] review legal questions for correctness, [but] we may ... grant a trial court discretion in its application of the law to a given fact situation." *Covey v. Covey*, 2003 UT App 380, ¶ 19, 80 P.3d 553 (alterations and omission in original) (quotations and citations omitted).

## ANALYSIS

### I. Parol Evidence

■■■ ¶ 13 Defendants claim that the trial court erred in admitting parol evidence regarding an oral agreement contrary to the plain meaning of the closing statement, arguing that the closing statement was an unambiguous integrated agreement. "The parol evidence rule operates in the absence of fraud to exclude [prior and] contemporaneous conversations, statements, or representations offered for the purpose of varying or adding to the terms of an integrated contract." *Novell, Inc. v. Canopy Group, Inc.*, 2004 UT App 162, ¶ 10, 92 P.3d 768 (alteration in original) (quotations and citation omitted). In applying the parol evidence rule, the court must first "determine whether the agreement is integrated." *Hall v. Process Instruments & Control, Inc.*, 890 P.2d 1024, 1027 (Utah 1995).

## A. Integrated Agreement

¶ 14 Defendants assert that the closing statement was an integrated agreement because it was signed by Plaintiffs, detailed the final distribution of the loan proceeds, and did not reference any other document. Defendants further assert that because the agreement was integrated the trial court erred in allowing testimony pertaining to a separate oral agreement. Whether evidence is admissible is a question of law, which we review for correctness, incorporating a clearly erroneous standard of review for the subsidiary factual determination of whether the parties adopted a writing as a complete integration of their agreement. *See Spears v. Warr*, 2002 UT 24, ¶ 18, 44 P.3d 742.

¶ 15 "An agreement is integrated where the parties thereto adopt a writing or writings as the final and complete expression of the agreement." *Smith v. Osguthorpe*, 2002 UT App 361, ¶ 17, 58 P.3d 854 (quotations and citation omitted). In determining whether the writing was intended by the parties to be a complete expression of the agreement, parol evidence, indeed any relevant evidence, is admissible. *See Novell*, 2004 UT App 162 at ¶ 11, 92 P.3d 768. " 'However, to preserve the integrity of written contracts, we apply a rebuttable presumption that a writing which on its face appears to be an integrated agreement is what it appears to be.' " *Id.* (quoting *Smith*, 2002 UT App 361 at ¶ 18, 58 P.3d 854). Furthermore, "[a] party may introduce 'all relevant evidence' to rebut the presumption." *Cantamar, L.L.C. v. Champagne*, 2006 UT App 321, ¶ 12, 142 P.3d 140 (citation omitted).

¶ 16 Plaintiffs assert that the closing statement is not a complete expression of their agreement and does not on its face appear to be an integrated agreement because the document did not contain an integration clause, a mutual release, or any statement indicating that it represented a final agreement of the parties. Plaintiffs also maintain that the closing statement is facially incomplete because it contains only an abbreviated description of the extension fee provision. The trial court found that the extension fee provision was not clear from the closing statement's language, "30 day Loan extension Beck Street," and that Huish had explained the provision to Plaintiffs in terms of a separate oral agreement. We conclude that Plaintiffs successfully rebutted any presumption of integration by demonstrating that the closing statement, with its abbreviated description of a key provision, does not appear on its face to be a complete expression of the parties' agreement.

¶ 17 In determining whether the parties actually intended the closing statement to be a complete expression of the agreement, the trial court considered testimony pertaining to a separate oral agreement regarding the distribution of the Waterpro Loan proceeds. "[E]vidence of an alleged oral agreement 'bears directly on the issues whether the writing was adopted as an integrated agreement and if so whether the agreement was completely integrated or partially integrated.' " *Id.* at ¶ 15 (quoting Restatement (Second) of Contracts § 217 cmt. b (1981)). Thus, the trial court did not err in admitting parol evidence regarding the separate oral agreement for the purpose of deciding the integration issue.

¶ 18 The trial court, having properly admitted parol evidence, considered the evidence and determined that the closing statement was, in fact, not integrated because the parties had entered into a separate oral agreement regarding the distribution of the Waterpro Loan proceeds. The oral agreement, as found by the trial court, provided that Utah Funding would set aside a portion of the Waterpro Loan proceeds to pay for future extension fees, and would return any unused proceeds to Plaintiffs.

¶ 19 The trial court concluded that the closing statement was an incomplete expression of the parties agreement as it specified the amount to be utilized for the "30 day Loan extension Beck Street" without including the agreed upon manner in which the funds were to be handled; i.e., payment of November and future extension fees with any unused portion returned to Plaintiffs. Additionally, Plaintiffs assert and the trial court found that the closing statement was not a final statement of the parties' intentions as to all the matters contained therein. The trial

court's conclusion that the closing statement was an incomplete expression of the parties' agreement is corroborated by both the closing statement and the testimony of the parties. The closing statement is simply an itemized list which includes only a breakdown of the closing costs and the disbursements to be made with the Waterpro Loan proceeds. Likewise, the extension fee provision included in the closing statement, "30 day Loan extension Beck Street," appears to be an annotation of the parties' oral agreement which contained the terms of the arrangement. Moreover, the record contains testimony of the parties that supports the trial court's conclusion that the closing statement was not a final statement of the parties' intentions. Therefore, we conclude that the trial court's ruling that the parties did not adopt the writing as a complete integration of their agreement was not clearly erroneous and the closing statement was not an integrated agreement.

### B. Ambiguity

¶ 20 Defendants next contend that the instructions for disbursement of the $27,955.98 in the closing statement were unambiguous because they clearly specified the amount to be disbursed for the extension.[5] Plaintiffs assert that the terms do not clearly state what was meant by "30 day Loan extension Beck Street." We review the trial court's determination that the closing statement was ambiguous under a correctness standard, granting it no particular deference. *See Oliphant v. Estate of Brunetti*, 2002 UT App 375, ¶ 14, 64 P.3d 587.

¶ 21 "[A] court may consider extrinsic evidence if the meaning of the contract is ambiguous or uncertain." *Ward v. Intermountain Farmers Assoc.*, 907 P.2d 264, 268 (Utah 1995). "Language in a contract is ambiguous if the words used to express the intent of the parties are insufficient so that the contract may be understood to reach two or more plausible meanings."

*Saunders v. Sharp*, 840 P.2d 796, 802 (Utah Ct.App.1992) (quotations and citation omitted). "When determining whether a contract is ambiguous, any relevant evidence must be considered." *Ward*, 907 P.2d at 268. "If after considering such evidence the court determines that the interpretations contended for are reasonably supported by the language of the contract, then extrinsic evidence is admissible to clarify the ambiguous terms." *Id.*

¶ 22 The trial court considered the testimony of the parties related to their interpretation of the disbursement language in the closing statement, and determined that the closing statement was ambiguous as to the meaning of the terms. Plaintiffs interpreted the closing statement to mean that both the November extension fee and future extension fees would be paid with the $27,955.98. In contrast, Huish asserted that the language in the closing statement provided that those funds were for the November extension fee only. Because the language of the closing statement is reasonably susceptible to either interpretation, the court properly considered parol evidence to ascertain the meaning of its terms. We conclude that the trial court did not err in finding the terms of the closing statement ambiguous and therefore considering parol evidence to determine the meaning of the statement's terms.

### II. Statute of Frauds

¶ 23 Defendants argue that the statute of frauds bars enforcement of the alleged oral agreement because, they claim, the agreement constituted an escrow agreement and pertained to a conveyance of land. Plaintiffs, on the other hand, assert that the statute of frauds is not applicable because the agreement at issue did not include a conveyance of any interest in land.[6]

¶ 24 First, Defendants assert that the oral agreement constituted an es-

---

5. The statement provided: "To: Utah Funding and Loan, $27,955.98, For: 30 day Loan extension Beck Street."

6. Plaintiffs raise several additional arguments. They assert that even if the statute of frauds

applies, it was waived, and if applicable, it was satisfied by the closing statement. Because we find that the statute of frauds is not applicable in this case we do not address these arguments.

crow agreement, and that the court erred in finding that no escrow agreement was created by the parties' oral agreement. Defendants assert this position without providing reasoned analysis and legal support as to why the parties' oral agreement should be considered an escrow agreement. Defendants' entire escrow agreement argument consists of a couple sentences. Defendants address the escrow issue in their brief by describing the oral agreement and stating that the "alleged oral agreement ... constitutes an escrow agreement." Defendants address this issue again briefly in their reply brief by providing the Black's Law Dictionary definition of escrow. In essence, Defendants' entire argument is made only in passing. Because Defendants fail to adequately brief the escrow agreement issue, we decline to review this argument.[7]

¶ 25 Second, Defendants contend that the statute of frauds applied because the oral agreement pertained to a conveyance of land. Defendants assert that the Waterpro Loan is a security interest in the Beck Street land, and that therefore the statute of frauds requires a writing. *See* Utah Code Ann. 25–5–3 (1998) (providing that every contract for any interest in land shall be void unless in writing). "The applicability of the statute of frauds is a question of law to be reviewed for correctness." *Spears v. Warr*, 2002 UT 24, ¶ 23, 44 P.3d 742. "Generally, a conveyance of real property is within the statute of frauds and unenforceable absent a writing." *Id.* at ¶ 22.

¶ 26 Here, the oral agreement did not contemplate any transfer of an interest in land from one person to the other. The subject matter of the oral agreement concerned only the proceeds from the Waterpro Loan. *Cf. Corbet v. Corbet*, 24 Utah 2d 378, 472 P.2d 430, 432 (1970) (holding that the statute of frauds is not invocable to prevent a trial court from considering the proceeds from a sale of land in settling accounts of a partnership because the court was only concerned with the proceeds of the sale); *Mack-*

*intosh v. Hampshire*, 832 P.2d 1298, 1301–02 (Utah Ct.App.1992) (holding that the trial court erred in characterizing plaintiff's claims as one for an interest in real property when the amended complaint specifically claimed a share of the monetary profits gained from real estate development projects). Because the oral agreement only concerns the loan proceeds, and not the transfer of an interest in real property, etc., the statute of frauds is not applicable to the parties' oral agreement.

### III.  Breach of Fiduciary Duty

¶ 27 Defendants also contend that there was insufficient evidence for the trial court to find that Huish breached his fiduciary duty to Defendants. Whether a party breached a fiduciary duty is a mixed question of fact and law in which we grant the trial court ample discretion. *See C & Y Corp. v. General Biometrics, Inc.*, 896 P.2d 47, 53 (Utah Ct. App.1995).

¶ 28 The trial court's ruling that Huish breached his fiduciary duty to Plaintiffs is amply supported by its findings. First, the trial court found that Huish acted as Plaintiffs' agent and owed them a fiduciary duty.[8] Second, the trial court found that Huish breached his fiduciary duty by failing to fully disclose that he would be taking a commission from various extension fees and from the Waterpro Loan proceeds. Third, the trial court further found that Huish told Plaintiffs that he would hold certain funds from the Waterpro Loan proceeds and return them if not used for future extension fees. Finally, the trial court found that Huish did not use the funds as promised and instead benefitted himself at the expense of Plaintiffs. The trial court's ruling is also supported by additional findings of fact and evidence found in the record. Specifically, that Huish had an ongoing relationship with UTCO whereby both UTCO and Huish received income from granting extensions. Also, that Huish had the authority to and did in fact set the roll over and extension fees he

---

7.  We may decline to review an argument imposing on us "the burden of argument and research." *Smith v. Four Corners Mental Health Ctr., Inc.*, 2003 UT 23, ¶ 46, 70 P.3d 904.

8.  At trial, Huish admitted that he acted as Plaintiffs' agent and understood that he owed them a fiduciary duty.

desired. Huish acted without disclosing the commission he would take or his role in setting the fees to Plaintiffs, who operated with the belief that Huish was working to obtain a long-term loan for them.

¶ 29 The record is replete with evidence of actions taken by Huish in breach of his fiduciary duty. Therefore, we conclude that sufficient evidence existed to support the trial court's finding of breach. The trial court did not err in finding that Huish breached his fiduciary duty.

## IV. Conversion

¶ 30 Defendants argue that the trial court erred in finding that Huish wrongfully converted proceeds from the Waterpro Loan. Defendants assert that the Waterpro Loan proceeds in question were properly used, as directed in the closing statement, for the November extension fee for the Beck Street Loan. The trial court ruled that Defendants converted the Waterpro Loan proceeds when they refused to return the portion of the proceeds not used in accordance with the parties' oral agreement to hold those funds for further extension fees and return any unused funds to Plaintiffs. "Whether the trial court properly applied the law of conversion is a legal question, which we review for correctness." *Fibro Trust, Inc. v. Brahman Fin., Inc.,* 1999 UT 13, ¶ 19, 974 P.2d 288.

¶ 31 Conversion is an act of willful interference with property, done without lawful justification, by which the person entitled to property is deprived of its use and possession. *See Jones v. Salt Lake City Corp.,* 2003 UT App 355, ¶ 9, 78 P.3d 988. " '[A] party alleging conversion must show that he or she is entitled to *immediate possession* of the property at the time of the alleged conversion.' " *Id.* (quoting *Fibro Trust,* 1999 UT 13 at ¶ 20, 974 P.2d 288).

¶ 32 The trial court's ruling that Defendants' conduct constituted conversion was based on the following findings of fact concerning the parties' oral agreement and Huish's conduct in retaining the funds: Huish agreed to hold $27,955.98 from the Waterpro Loan proceeds, and to use those funds to pay "further extension fees or interest, or to pay commissions to Huish for his work in obtaining the long term financing"; Huish used $9314 of the funds to pay UTCO for the November extension fee; Huish informed Plaintiffs that another extension fee would be needed for December; Plaintiffs requested the return of the unused portion of the Waterpro Loan proceeds; and Huish refused to return the funds. Defendants contest the validity of the parties' oral agreement and assert that they properly handled the Waterpro Loan proceeds because they acted in conformity with the closing statement. Defendants maintain that the statute of frauds bars enforcement of the alleged oral agreement because, they claim, the agreement constituted an escrow agreement and pertained to a conveyance of land. We have already declined to address Defendants' escrow agreement argument for inadequate briefing and determined that the statute of frauds is not applicable to the parties' oral agreement. Therefore, we review the trial court's ruling that Defendants converted the funds in light of the oral agreement.

¶ 33 According to the parties' oral agreement, Defendants were required to return that portion of the funds not utilized to pay further extension fees to Plaintiffs. Defendants did not use the funds to pay for any further extension fees; rather, Defendant Huish requested additional extension fees for December. Plaintiffs requested that the funds be returned, which Huish refused to do. Because Plaintiffs were entitled to receive the unused funds, we conclude that Huish converted the funds when he refused to return them to Plaintiffs. Therefore, we affirm the trial court's finding of conversion.

## V. Punitive Damages

¶ 34 Defendants contend that the punitive damages the trial court awarded were unwarranted, excessive, and violated their constitutional right to due process. The trial court first awarded Plaintiffs actual damages in the amount of $18,643.98 plus statutory interest, and then awarded punitive damages to Plaintiffs in the amount of $50,000. The trial court based the punitive damages award on Huish's overall conduct, which the court

concluded was in reckless disregard of the rights of others. "Whether punitive damages [should be] awarded is generally a question of fact within the sound discretion of the [fact finder], and will not be disturbed absent an abuse of discretion." *ProMax Dev. Corp. v. Mattson*, 943 P.2d 247, 259 (Utah Ct.App. 1997) (alterations in original) (quotations and citation omitted).

¶ 35 Defendants first assert, without further explanation or briefing, that the trial court erred in awarding punitive damages because said damages were unwarranted. Because we have before us no reasoned analysis from Defendants, we decline to address this particular claim. *See Smith v. Four Corners Mental Health Ctr., Inc.*, 2003 UT 23, ¶ 46, 70 P.3d 904.

¶ 36 Defendants next assert that the trial court's punitive damages award of $50,000, violated their constitutional due process rights because the award was excessive and was calculated without properly considering Huish's relative wealth. Defendants purport to raise a constitutional due process challenge; however, they do not specify whether they are alleging a violation of the state or federal constitution. Defendants assert that the trial court erred in awarding punitive damages without undergoing an analysis that the conduct was reprehensible. Reprehensibility is a factor in evaluating whether an award of punitive damages is excessive under the Due Process Clause of the United States Constitution. *See Campbell v. State Farm Mut. Auto., Ins. Co.*, 2004 UT 34, ¶¶ 19, 21, 98 P.3d 409 (listing the federal due process guideposts enunciated by the Supreme Court in *BMW of North Amer-* *ica, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)).

¶ 37 Although Defendants raise the issue of reprehensibility, they did not brief the factors that the Supreme Court enunciated in *Gore*. Rather, Defendants focus only on the *Crookston* factor of relative wealth, *see Crookston v. Fire Ins. Exch.*, 817 P.2d 789, 808 (Utah 1991). Because Defendants fail to adequately brief the excessiveness issue as a federal constitutional challenge, we simply evaluate the punitive damages award for excessiveness under the *Crookston* relative wealth factor as raised. *See Smith v. Fairfax Realty, Inc.*, 2003 UT 41, ¶ 30, 82 P.3d 1064 (addressing only the *Crookston* factors for failure to adequately brief the excessiveness issue as a federal constitutional challenge).

¶ 38 In assessing the amount of punitive damages to be awarded, the trier of fact must consider seven factors, one of which is the relative wealth of the defendant.[9] *See Hall v. Wal–Mart Stores, Inc.*, 959 P.2d 109, 111 (Utah 1998). However, the introduction of evidence as to the relative wealth of the defendant is not a technical prerequisite to an award of punitive damages. *See id.* at 112.[10] "[T]he defendant who appears to have wealth but in fact does not, should not expect the plaintiff to point this out to [the trier of fact] for him. He himself must present to [the trier of fact] evidence of his inability to pay a large award of punitive damages." *Id.* at 113. The general rule is that where the punitive damages award is under $100,000, and is less than three times the amount of actual damages, it

9. In *Crookston v. Fire Insurance Exchange*, 817 P.2d 789 (Utah 1991), the Utah Supreme Court enunciated seven factors to be considered in assessing the amount of punitive damages to be awarded including: (I) the relative wealth of the defendant; (ii) the nature of the alleged misconduct; (iii) the facts and circumstances surrounding such conduct; (iv) the effect thereof on the lives of the plaintiff and others; (v) the probability of future recurrence of the misconduct; (vi) the relationship of the parties; and (vii) the amount of actual damages awarded. *See id.* at 808. Defendants contend only that the trial court failed to consider the relative wealth factor; therefore, we do not address the other six factors.

10. In *Hall v. Wal–Mart Stores, Inc.*, 959 P.2d 109 (Utah 1998), the Utah Supreme Court held that "while evidence of relative wealth is important, and should be considered by [a trier of fact], failure on the part of the plaintiff to introduce such evidence is not automatically fatal to an award of punitive damages." *See id.* at 113. "[A] defendant's wealth can be either an aggravating or a mitigating factor in determining the size of a punitive damage award." *Diversified Holdings, L.C. v. Turner*, 2002 UT 129, ¶ 15, 63 P.3d 686.

is presumed that the award is not excessive and no evidence of relative wealth is required to sustain the award. *See Crookston*, 817 P.2d at 810 ("Generally, we have found punitive damage awards below $100,000 not to be excessive only when the punitives do not exceed actual damages by more than a ratio of approximately 3 to 1."); *see also Hall*, 959 P.2d at 113 ("The plaintiff is not required to introduce evidence of a defendant's relative wealth, but would be wise to do so, as under *Crookston I*, an award which is presumptively excessive and might otherwise be struck down, can be justified by the defendant's relative wealth.").[11]

■ ¶ 39 The trial court awarded Plaintiffs actual damages in the amount of $18,643.98 plus statutory interest, and then awarded punitive damages in the amount of $50,000. The punitive damages in this case are well under $100,000, and less than three times the amount of the actual damages awarded in this case. Thus, the punitive damages award does not exceed the acceptable ratio for punitive to actual damages and is not presumptively excessive. Plaintiffs, therefore were not required to introduce evidence of Huish's relative wealth, nor was the trial court required to justify its award by reference to Huish's relative wealth.[12]

¶ 40 Furthermore, Plaintiffs sought punitive damages in their complaint and in their opening and closing arguments at trial. Defendants did not address or even actively oppose punitive damages at trial, and at no time did they assert an inability to pay or raise any other mitigating factors.[13] Rather, Defendants merely asserted in their Motion for New Trial or To Alter or Amend Judgment that the punitive damages award was excessive and that the trial court failed to consider relative wealth.

¶ 41 In sum, the punitive damages award was within the acceptable range set forth in *Crookston*. Therefore, it is presumed that the award is not excessive and no evidence of relative wealth is required to sustain the award. If such evidence had been presented by either party, the trial court would have been required to consider that information in its calculation of punitive damages. In the absence of such information, however, we conclude that the punitive damages awarded Plaintiffs were not excessive and did not violate Defendants constitutional due process rights.

## VI. Prejudgment Interest

¶ 42 The trial court awarded Plaintiffs prejudgment interest in the amount of $7,923.36. Defendants assert that the trial court erred in awarding prejudgment interest because the damages amount was uncertain and changed as the case evolved. Defendants claim that because the Plaintiffs' complaint alleged damages in the amount of approximately $27,955.98 and Plaintiffs were awarded $18,643.98, damages were not certain enough to support prejudgment interest. "A trial court's decision to grant or deny prejudgment interest presents a question of law which we review for correctness." *Smith v. Fairfax Realty, Inc.*, 2003 UT 41, ¶ 16, 82 P.3d 1064 (quotations and citation omitted).

■ ¶ 43 "Prejudgment interest is properly awarded when the damage is complete, the loss can be measured by facts and figures, and the amount of loss is fixed as of a particular time. [A] court may only award prejudgment interest if damages are calculable within a mathematical certainty." *Orlob v. Wasatch Med. Mgmt.*, 2005 UT App 430, ¶ 35, 124 P.3d 269 (alteration in original) (quotations and citation omitted).

11. Likewise, an award that is presumptively excessive may be justified by an explanation of why the case is unique, usually in terms of one of the established seven factors. *See Crookston*, 817 P.2d at 811.

12. The trial court in its Ruling and Order on Defendants' Motion for a New Trial or To Alter or Amend Judgment clarified that, in awarding punitive damages, it heard and considered Huish's testimony about his income and wealth sufficient to justify the award. However, we

need not determine whether the evidence was sufficient to justify the award because the punitive damages award in this case is not presumptively excessive.

13. Although Defendants submitted an affidavit from Huish asserting that Defendants did not have $50,000 available, they did not present any evidence of relative wealth or inability to pay to support this assertion.

¶ 44 In this case, Plaintiffs' losses were fixed when Huish refused to return the money. The amount of the loss is quantifiable and calculable within a mathematical certainty: the $27,955.98 held by Huish less the $9314 paid to UTCO as an extension fee.[14] Plaintiffs assert that the fact that they sought the entire $27,95.98 in their complaint is irrelevant. Plaintiffs explain that during the course of litigation they learned that Huish had appropriately disbursed a portion of the money, and reduced their claim of loss accordingly.

¶ 45 The fact that the parties dispute or reduce the amount of damages does not in and of itself mean that damages are incomplete or cannot be calculated with mathematical accuracy. *See Fairfax Realty*, 2003 UT 41 at ¶ 23, 82 P.3d 1064 (finding that simply because the parties disputed the value of the property at trial did not change the supreme court's conclusion that the jury's determination of the value was ascertained in accordance with fixed rules of evidence and known standards of value). The nature of losses that cannot be calculated with mathematical accuracy are those in which damage amounts are to be determined by the broad discretion of the trier of fact, such as in cases of personal injury, wrongful death, defamation of character, and false imprisonment. *See id.* at ¶ 20; *Kraatz v. Heritage Imps.*, 2003 UT App 201, ¶ 64, 71 P.3d 188.

¶ 46 The trial court ruled that prejudgment interest was proper because the amount owing to Plaintiffs was calculable as of a particular time and thus exactly quantifiable. We review the trial court's ruling for correctness and conclude that the trial court did not err in awarding prejudgment interest because Plaintiffs' losses were fixed and quantifiable within a mathematical certainty when Huish refused to return the unused Waterpro Loan proceeds, amounting to $27,955.98 less the $9314 properly paid to UTCO as an extension fee.

## VII. Personal Liability

¶ 47 The trial court determined that Huish was personally liable for Plaintiffs' damages. Defendants claim that the corporate shield defense prevents Huish from incurring personal liability. Specifically, Defendants assert that the trial court erred in finding Huish personally liable for failing to disclose that he was taking a commission from the Waterpro Loan proceeds and setting the amount of various extension fees, because the acts were done with input from Kent and in the course and scope of his employment with Utah Funding.[15] Whether the court erred in finding Huish personally liable for acts done in the course and scope of his employment is a mixed question of law and fact. We "review legal questions for correctness, [but] we may ... grant a trial court discretion in its application of the law to a given fact situation." *Covey v. Covey*, 2003 UT App 380, ¶ 19, 80 P.3d 553 (alteration and omission in original) (quotations and citation omitted).

¶ 48 "[A]n officer or director of a corporation is not personally liable for torts of the corporation or of its other officers and agents merely by virtue of holding corporate office, but *can only incur personal liability by participating in the wrongful activity.*" *Armed Forces Ins. Exch. v. Harrison*, 2003 UT 14, ¶ 19, 70 P.3d 35 (emphasis added); *see also Mecham v. Benson*, 590 P.2d 304, 308 (Utah 1979) (noting that a defendant, by attempting to hide behind the corporate entity, "would not exculpate himself by proving that he was acting as agent of a corporation; he would only additionally inculpate his cor-

---

14. In so calculating, we note that our calculation of the amount of loss is $18,641.98, which is two dollars less than the trial court's award. However, the trial court's error in calculation is negligible and likely a typographical error. Thus, the error does not affect our analysis that the amount of loss is calculable within a mathematical certainty.

15. Plaintiffs assert that the corporate shield defense was not raised in Defendants' answer or at any time prior to trial, and that the trial court held the corporate shield defense waived. The trial court in its Ruling and Order on Defendants' Motion for a New Trial or To Alter or Amend Judgment reiterated the parties' arguments including Plaintiffs' waiver argument, however, it did not specifically address the issue of waiver. Rather, the court merely proceeded to find Huish personally liable.

porte principal"). Furthermore, a corporate officer or director can incur personal liability for his own acts even though the action is done in furtherance of the corporate business. *See Armed Forces Ins. Exch.,* 2003 UT 14 at ¶ 19, 70 P.3d 35.

¶ 49 In the instant case, the trial court found that Huish personally, and in breach of his fiduciary duty to Plaintiffs, took a commission from the Waterpro Loan proceeds and set the amount of various extension fees without full disclosure to Plaintiffs. Additionally, the trial court found that Huish personally converted the funds when he refused to return the unused portion of the Waterpro Loan proceeds as per the parties' oral agreement. We have previously found that sufficient evidence exists to support these findings, and review the trial court's determination of Huish's personal liability giving the "trial court discretion in its application of the law to a given fact situation." *Covey,* 2003 UT App 380, ¶ 19, 80 P.3d 553 (quotations and citation omitted). We conclude that Defendants' corporate shield defense fails because Huish personally committed acts in breach of his fiduciary duty to Plaintiffs which resulted in damage to Plaintiffs. Accordingly, we find no error in the trial court's finding that Huish was personally liable for the damages caused by his own actions.

## CONCLUSION

¶ 50 The disbursement language contained in the closing statement was not integrated and was ambiguous. Thus, the trial court properly considered parol evidence and determined that the parties entered into an oral agreement regarding the disbursement of the Waterpro Loan proceeds. The oral agreement does not pertain to a conveyance in land and therefore the statute of frauds is not applicable. Huish incurred personal liability when he breached his fiduciary duty to Plaintiffs by failing to disclose that he would be taking a commission from the Waterpro Loan proceeds, and Defendants committed conversion by wrongfully refusing to return the unused loan proceeds.

¶ 51 The punitive damages awarded by the trial court was within the presumed accept-able range set forth in *Crookston.* The award is not excessive. No evidence of relative wealth is required to sustain the award, and the trial court need not consider the question of relative wealth absent the presentation of relevant evidence. Thus, since the punitive damages awarded Plaintiffs were not excessive, they did not violate Defendants' constitutional due process rights. Finally, prejudgment interest was properly awarded because Plaintiffs' losses were fixed, could be measured by facts and figures, and were calculable within a mathematical certainty.

¶ 52 The judgment is affirmed.

¶ 53 WE CONCUR: JUDITH M. BILLINGS and CAROLYN B. McHUGH, Judges.