2008 UT 33

Masakazu SHIBA; Shizue F. Shiba; Masakazu Shiba, Trustee of the Riye Shiba Marital and Family Trust; and Masakazu Shiba, Trustee of the Masazo Shiba Marital and Family Trust, Plaintiffs and Appellants,

v.

Toshiro SHIBA; Jean O. Shiba; Seiji Shiba; Della Kono Shiba; Ronald Nishijima; Natsuye Nishijima; Ronald Nishijima and Natsuye Nishijima, Trustees of the Ronald and Natsuye Family Trust; Toshiro Shiba, Trustee of the Riye Shiba Marital and Family Trust; Toshiro Shiba, Trustee of the Masazo Shiba Marital and Family Trust; and Does 1–10, Defendants and Appellees.

No. 20060560.

Supreme Court of Utah.

May 13, 2008.

M. James Brady, Margot Edwards, Provo, for plaintiffs.

Evan A. Schmutz, Andrew V. Wright, M. Reed Adams, Provo, David Ray Carter, Salt Lake City, for defendants.

WILKINS, Justice:

¶ 1 Appellant Masakazu Shiba appeals the trial court's determination that Appellee Toshiro Shiba is entitled to fifty percent of the

proceeds from the sale of their father's residence. Masakazu also appeals the trial court's conclusion that the distribution scheme in the family trust was never amended and, therefore, the assets were intended to remain in the estate until their father's death. We conclude that the trial court's determinations were correct and therefore affirm.

## BACKGROUND

### I. THE SHIBA FARM AND THE MASAZO MARITAL AND FAMILY TRUST

¶ 2 Appellant Masakazu Shiba ("Sok") and Appellees Toshiro Shiba ("Tosh"), Natsuye Nishijima ("Nats"), and Seiji Shiba ("Seiji") are the children of Masazo ("Mas") and Riye Shiba, both of whom are deceased. During the 1950s, Mas, Tosh, and Sok began to acquire farmland in Lehi, Utah (the "Shiba Farm"). In early 1959, Mas and Tosh acquired an additional one hundred acres of land by warranty deed, with each retaining an undivided fifty percent interest as joint tenants. Within that one hundred acres was a thirty-acre parcel that Tosh and Mas used to build their homes.

¶ 3 On December 31, 1985, Mas acted as Trustor in executing the Masazo Shiba Marital and Family Trust (the "Trust"). Tosh and Sok were named as joint trustees of the Trust. The Trust provided, among other things, that upon Mas' death, Tosh's home—including the 1.49 acre lot upon which it was built—should be distributed to Tosh and his heirs. Furthermore, the Trust provided that Mas' primary residence and lot should be distributed to Sok and his heirs. Also on December 31, 1985, Mas conveyed his right title and interest in the Shiba Farm (including the thirty-acre parcel of land where his and Tosh's homes were located) to the Trust. Tosh, however, did *not* convey his interest in the thirty-acre parcel to the Trust; instead, Tosh retained his fifty percent interest in both of the homes and the land upon which they were built.

### II. THE SHIBA FARM LIMITED PARTNERSHIP

¶ 4 On December 31, 1985, Mas and Riye created the Shiba Farm Limited Partnership (the "Partnership") as part of their overall estate plan. On that same day, Mas and Riye conveyed the Shiba Farm to the Partnership, and it became the Partnership's primary asset. Also on December 31, 1985, Mas and Riye transferred their interest in the Partnership to the Trust.

¶ 5 The Limited Partnership Agreement (the "LP Agreement") named Sok and Tosh as general partners and named eight limited partners.[1] The LP Agreement provided, among other things, that the profits could be distributed "provided that all of the partners shall participate in any such distribution pro rata in accordance with their respective capital contributions." The LP Agreement also stated that upon dissolution, the general partners could "elect to distribute undivided interests in partnership property to the partners in kind in proportion to their capital accounts at the time of distribution." Finally, the LP Agreement could only be amended by compliance with section 15.8 of the Articles of Incorporation.[2]

### III. AMENDMENTS TO THE TRUST

¶ 6 On December 4, 1990, Mas executed the First Amendment to the Trust, which provided that the interest in the Partnership owned by the Trust "*shall* be distributed in such a way as to achieve a final percentage of

---

1. The eight named limited partners were Mas, Riye Shiba, Jean Shiba, Shizue Shiba, Seiji, Della Shiba, and Nats and Ronald Nishijima.

2. Section 15.8 states as follows:
   *Amendments*. If the General Partners shall propose in writing to the Limited Partners the adoption of an amendment to this agreement, and if, within thirty (30) days of the giving of a notice containing such proposal, more than fifty-one percent (51%) in ownership interest of the partners, including the General Partners, shall have given their written consent thereto, then each Limited Partner, shall, if requested, promptly execute or cause to be executed one or more amendments to this agreement and certificates of the partnership as may be required to reflect such amendments under the laws of the jurisdictions in which the partnership does business at such time.

ownership" of any real property held by the Trust among the Shiba children as follows: (1) Sok, 43.5%; (2) Tosh, 43.5%; (3) Nats, 6.5%; and (4) Seiji, 6.5%. (Emphasis added.) On December 27, 1990, Mas executed the Second Amendment to the Trust, which simply provided a legal description of Mas' residence. No additional amendments were made to the Trust.

## IV. THE FAMILY AGREEMENT

¶ 7 At some point prior to 1994, Tosh and Sok became unable to cooperate and manage the Trust or the Partnership. These difficulties subsequently led to litigation. As a result of the litigation, it was decided that the Shiba Farm would be sold. After consulting a lawyer, the partners decided that in order to avoid a significant capital gains tax on the sale of the Shiba Farm, they would effect a Section 1031 "like-kind" exchange (the "Exchange Plan"), which would substitute suitable property into the Partnership to replace the Shiba Farm. The Exchange Plan proposed allocating the Partnership assets to the various children, who would each then be responsible for locating a property to "replace" their designated share. The Partnership would then sell the Shiba Farm and purchase those prospective properties with the proceeds; any income, loss, or expenses for the future properties would be attributed to the individual who located the particular asset. After further review, however, the lawyer determined that implementation of the Exchange Plan required modification of the LP Agreement to allow specific allocation of assets, income, and expenses among the various partners. The LP Agreement, however, was never modified or amended.

¶ 8 On December 3, 1994, the Shiba family met in an effort to implement the Exchange Plan. During the meeting, all of the partners executed an agreement that incorporated and specifically indicated an intent to be bound by four identified documents: (1) the "No Change Pledge to the Masazo Shiba Marital and Family Trust Agreement" (the "No Change Pledge") (2) the "Exchanging Properties From Farm Sale—December 3, 1994," (the "Exchange Document"), (3) the "Pre-Allocation Plans A & B ... December 1, 1994," and (4) the "Present Ownership Schedule ... Oct. 22, 1994" (the "P.O. Schedule"). Collectively, these four documents are referred to as the Family Agreement.

¶ 9 In order to facilitate the Exchange Plan, Mas had to amend the Trust to allow for the specific allocation of assets, income, and expenses among the various partners. Mas agreed to do this by executing the No Change Pledge.[3] However, Mas never amended the Trust in the manner contemplated. Furthermore, although the fourth paragraph of the No Change Pledge gives the beneficiaries of the Trust the ability to acquire exchange properties upon the sale of the Shiba Farm using their anticipated trust inheritances, the paragraph also specifically states that "[t]he pre-allocated amount and its earnings shall remain [Mas'] property *until such time of distribution from my estate.*" (Emphasis added.)

¶ 10 After the December 1994 meeting, each of the partners began looking for their respective "replacement" properties. Only two of the partners, however, were successful in locating any property: Nats and her husband Ron located a building lot in Farmington (the "Farmington Lot"), and Sok located a medical office building (the "Clinic"). The Shiba Farm was subsequently sold in January 1995, thus triggering the need for the exchange properties in order to avoid the capital gains taxes. Because replacement properties could not be found by all the partners, the family decided that Tosh, Sok, and the Trust would contribute funds to purchase the Clinic on the express condition that when Sok located appropriate financing, their funds would be promptly released. On July 6, 1995, the Clinic was purchased for $1,610,415.[4] The warranty deed delivered in

---

3. The revelant portion of the No Change Pledge states as follows: "I will cooperate by amending my trust to facilitate [the Exchange Plan] outlined in the document entitled 'Exchanging Properties From Farm Sale presented in family meeting on December 3, 1994.'"

4. The following parties purchased the Clinic in the following percentages of ownership: 69.48% ($1,118,628) from the Partnership; 13.76% ($221,536) each from Tosh and Sok; and 3% ($48,300) from the Trust.

connection with the purchase of the Clinic established title to the parties in the same percentages as they had contributed to the purchase price.

¶ 11 For several years, the Partnership made tax declarations and accountings indicating that all of the Partnership properties—including the Farmington Lot,[5] the Clinic, and various investment accounts—were held by the Partnership in the same percentage of ownership as the Shiba Farm had been before it was sold. Pursuant to the advice of accountants, Tosh performed re-accountings according to the pre-allocations for the tax years 1996 through 1999. The partners were not satisfied with the 1999 accounting; specifically, Sok believed he had "cashed out" the other partners and believed he now owned the Clinic outright and had no need to account. Distribution of the proceeds from the sale of the Clinic pursuant to the Trust is one of the issues Sok now disputes on appeal.

## V. THE FIDELITY ACCOUNT

¶ 12 Some time after 1959, Mas and Tosh both built residences on the thirty-acre parcel located within the one hundred acres they had acquired by warranty deed. Title to those properties was originally placed in the name of Mas and Tosh as joint tenants. As previously discussed, Mas subsequently conveyed *his* interest in the parcel to the Trust by quitclaim deed, which severed the joint tenancy and created a tenancy in common. Tosh, however, retained his interest. Subsequently, when the family sold the Shiba Farm in January 1995, the Trust and Tosh also sold their interests in the thirty-acre parcel, including their interests in the two residential lots and homes. The proceeds from the sale of Mas' home and land—$142,000 [6]—were separated and placed in a separate Fidelity account (the "Fidelity Ac-

count").[7] Sok now disputes how the Fidelity Account is to be distributed between him and Tosh.

## VI. THE TRIAL COURT'S DECISION

¶ 13 In 1998, Mas died. After numerous failed attempts between Tosh and Sok to resolve their disputes over the Partnership and Trust, it was determined that the Partnership would be judicially dissolved. After bifurcating the proceedings, the trial court entered Findings of Fact, Conclusions of Law, an Order, and a Memorandum Decision. The trial court concluded that the Family Agreement validly amended the Trust to allow each partner to select and manage replacement properties and that the intent "was to preserve the tax advantage of a like-kind exchange for farm property to be sold and to diversify management of the assets." The trial court also concluded, however, that because Mas never made the necessary amendment to the Trust, the Family Agreement "did not remove the replacement propert[ies] from the estate plan … [but instead] specifically required that ownership of the properties remain within the partnership and ultimately be distributed in accordance with the [Trust]." Moreover, the trial court concluded that the Family Agreement modified the LP agreement, but only as to management of the replacement properties, and that distribution of the Partnership assets upon dissolution had to be effectuated as originally established by the LP Agreement.[8] Finally, the trial court concluded that Tosh was entitled to fifty percent of the funds held in the Fidelity Account. Sok subsequently filed this interlocutory appeal, which we granted.

## ANALYSIS

¶ 14 Sok raises two issues on appeal. First, Sok contends that the trial court erred

---

5. In 2000, the Partnership, as Grantor, conveyed the Farmington Lot to Ron and Nats by warranty deed. All other property has been retained in the name and title of the Partnership.

6. The parties indicate that the home was sold for $150,000. After $8,000 in costs and fees, $142,000 remained.

7. The proceeds from the sale of Tosh's residence were directed to Tosh pursuant to the terms of the Trust.

8. Pursuant to section 14.2 of the LP Agreement, "the General Partners may elect to distribute undivided interests in partnership property to the partners in kind in proportion to their capital accounts at the time of distribution."

when it concluded that Tosh is entitled to fifty percent of the proceeds held in the Fidelity Account. Second, Sok argues that the trial court erred in concluding that distribution of the Partnership assets was not modified by the Family Agreement. These questions involve principles of contract interpretation. Because neither of the parties claim that the Family Agreement is ambiguous, we look to the four corners of the document to determine how the terms impact the outcome. This is a legal conclusion, reviewed for correctness. *Kimball v. Campbell*, 699 P.2d 714, 716 (Utah 1985).

## I. THE FIDELITY ACCOUNT

¶ 15 Sok argues that the trial court erred when it concluded that Tosh is entitled to fifty percent of the proceeds from the sale of Mas' residence. More specifically, he contends that Tosh and Mas held the thirty-acre parcel as joint tenants, and when Mas conveyed his interest in the acreage to the Trust by quitclaim deed, he severed the joint tenancy, creating a tenancy in common. Moreover, Sok contends that when the tenancy in common sold the commonly owned acreage, each cotenant had a right to share in the proceeds of the sale according to their proportionate interests because tenants in common are presumed to hold equal, undivided shares in the commonly owned property. When Tosh and Sok agreed to be bound by the P.O. Schedule, however, Sok avers that they validly *modified* the distribution in a manner other than equal shares. In other words, Sok argues that the P.O. Schedule modified their original agreement regarding their individual interests in the thirty-acre parcel, effectively "rebutting" the tenancy in common presumption of equal, undivided interests in the property. Accordingly, Sok argues that the trial court erred when it concluded that Tosh had "never transferred [his interest] by any document or agreement until the entire farm was sold" and that Tosh retained legal title to fifty percent of the property.

¶ 16 Tosh, on the other hand, contends that the P.O. Schedule is not an agreement whereby he agreed to convey his interest in Mas' residence to Sok. First, the P.O. Schedule does not contain any language suggesting a conveyance, nor is there any deed or record of Tosh conveying his interest in Mas' home. Furthermore, while language in the No Change Pledge references the P.O. Schedule, it actually refutes Sok's contentions because it explicitly states that the "pre-allocated amount and its earnings *shall remain [Mas'] property until such time of distribution from my estate.*" (Emphasis added.) Tosh argues that this language shows that Mas clearly intended to retain ownership of the property until it was distributed from his estate. Accordingly, Tosh retained his interest in Mas' residence and the trial court correctly to concluded that the Family Agreement did not modify or vary the original plan for distribution of the Fidelity Account. We agree.

¶ 17 It is well settled that under a joint tenancy, both parties hold a concurrent ownership in the same property with a right of survivorship, i.e., each is "afforded the eventuality of a *full* ownership interest, conditioned upon the tenancy remaining unsevered, and one out-living the other." *Estate of Breckon v. State Tax Comm'n*, 591 P.2d 442, 443 (Utah 1979) (footnote omitted). It is also well settled that "a joint tenant of real property by conveying . . . his interest therein by a valid deed . . . severs and terminates the joint tenancy by the creation of a tenancy in common." *Tracy–Collins Trust Co. v. Goeltz*, 5 Utah 2d 350, 301 P.2d 1086, 1090 (1956). Moreover, "a joint tenant cannot dispose of more than his own interest in joint tenancy property, i.e., one-half thereof." *Breckon*, 591 P.2d at 444.

¶ 18 In this case, Tosh and Mas acquired, by warranty deed, the one hundred acre parcel as joint tenants. When Mas subsequently conveyed his interest in the acreage to the Trust, including the thirty-acre parcel where the homes were located, he severed the joint tenancy, thus creating a tenancy in common. Mas could only convey, however, his one-half interest in the property to the Trust. *See id.* Tosh never conveyed his interest to the Trust. Because Mas had only a fifty percent interest to convey to the Trust, Tosh retained legal title to half of the property. Accordingly, the trial court cor-

rectly awarded only fifty percent of the Fidelity Account to Sok as a specific devise of the Trust because the account should be shared equally by Sok and Tosh.[9]

## II. THE EFFECT OF THE FAMILY AGREEMENT ON DISTRIBUTION OF THE PARTNERSHIP ASSETS

¶ 19 Sok agrees with the trial court's determination that the Family Agreement constituted a valid amendment to the Trust and the LP Agreement. Sok disagrees, however, with the trial court's conclusion that

> the intent and effect of such amendment was not to remove the designated replacement properties ... from [the] overall estate but to temporarily delegate selection and management of replacement assets upon the sale of the farm land, and that such properties would remain in [the] estate until [Mas'] death when they would be distributed in accordance with the terms of [the Trust].

Instead, Sok argues, it is clear from the parties' intent and actions, i.e., extrinsic evidence, that the Family Agreement was not just an amendment that diversified management but also an amendment that modified *distribution* of the Partnership assets upon dissolution.

¶ 20 In contrast, Tosh contends that there has never been an effective amendment to the Trust or LP Agreement modifying distribution of the Partnership assets upon dissolution. More specifically, Tosh argues that because the LP Agreement clearly designates how the partners are to effectuate an amendment, the trial court correctly concluded that it did not have the equitable power to vary the terms of the LP Agreement to alter distribution of ownership shares where the partners had failed to properly amend the LP Agreement in compliance with section 15.8. Accordingly, Tosh urges, the Partnership assets should be distributed as set forth in the unamended LP Agreement.

¶ 21 We conclude that neither the Trust nor the LP Agreement was validly amended as to *distribution* of the Partnership assets. Although the Family Agreement is a valid contract which *authorizes* modification of distribution under the Trust and the LP Agreement, that modification never occurred. Indeed, Mas specifically indicated in the No Change Pledge that an amendment was forthcoming: "I will cooperate by *amending* my trust to facilitate exchanging of properties outlined in the [Exchange Document]". (Emphasis added.) The amendment, however, was never made.

¶ 22 Although no amendment to the Trust or LP Agreement regarding distribution ever occurred, based on the plain text in the Family Agreement documents, it is clear that Mas intended only to "temporarily delegate selection and management of replacement assets upon sale of the farm" and not to "remove the designated properties from his overall estate plan." *See LDS Hosp. v. Capitol Life Ins. Co.*, 765 P.2d 857, 858 (Utah 1988) ("[A] cardinal rule in construing [a] contract is to give effect to the intentions of the parties and, if possible, these intentions should be gleaned from an examination of the *text* of the contract itself." (emphasis added)). For example, the No Change Pledge specifically indicates that the beneficiaries "can use a pre-allocated amount equal to their expected (inherited) share based on value determined at the time of farm sale ... [but that the] pre-allocated amount and its earnings shall remain [Mas'] property *until such time of distribution from [his] estate*." (Emphasis added.) Furthermore, the No Change Pledge states that "[i]t is my continued desire that the estate plans *as previously written*, are to pass on my property ... as *prescribed in the first amendment of [the Trust]*." (Emphases added.) The Exchange Document also explicitly states that "*all replacement properties will remain* in the partnership and are its property *until such time that the partnership is dissolved*."

9. After the conveyance, the Trust owned Mas' fifty percent interest in the land. When the property was sold as part of the sale of the Shiba Farm, Tosh was entitled to fifty percent of the proceeds of his home and was entitled to the other fifty percent of the proceeds of his home through his inheritance from the Trust. As to the proceeds from Mas' home, Tosh was entitled to fifty percent of proceeds since he still maintained a fifty percent interest after it was conveyed to the Trust. Sok was entitled to the other fifty percent as a specific devise of the Trust.

(Emphases added.) If, as urged by Sok, certain assets should be removed from the distribution, this sentence would be rendered meaningless.[10]

¶ 23 In this case, then, the plain language of the Family Agreement indicates an intent "to preserve the tax advantage of a like-kind exchange for farm property to be sold and to diversify management of the assets ... [and] ... not [to] remove the replacement property from the [Trust]." It is clear that the Family Agreement intended to transfer only the ability to select and manage exchange properties but that the properties would remain in the estate until Mas' death. Accordingly, we conclude that the trial court correctly determined the Trust and LP Agreement were modified to "allow the selection and management of replacement properties ... but that ultimate ownership and ... distribution upon dissolution of the partnership would be as previously established."

## CONCLUSION

¶ 24 We conclude that Tosh retained his fifty percent interest in Mas' property and thus is entitled to fifty percent of the proceeds held in the Fidelity Account. Furthermore, we conclude that the Family Agreement did not modify the Trust or the LP Agreement as to distribution of the assets and that distribution should proceed as designated in the Trust. Affirmed.

¶ 25 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice PARRISH, and Justice NEHRING concur in Justice WILKINS' opinion.

---

10. If, as Sok contends, the Clinic was supposed to be exclusively Sok's property, that language never made it into the Trust. Accordingly, 69.48% of the Clinic should be considered the property of the Trust and distributed in such a way as to achieve the percentages delineated by the Trust, i.e., 43.5% to Sok, 43.5% to Tosh, 6.5% to Nats, and 6.5% to Seiji. *See supra* note 4.