2013 UT App 96

# THE UTAH COURT OF APPEALS

SAM ASHWORTH,

*Plaintiff and Appellant,*

*v.*

MURPH BULLOCK,

*Defendant and Appellee.*

Opinion
No. 20120278-CA
Filed April 18, 2013

Fourth District, American Fork Department
The Honorable Christine S. Johnson
No. 110100316

James H. Deans, Attorney for Appellant
Sidney Balthasar Unrau, Attorney for Appellee

JUDGE CAROLYN B. MCHUGH authored this Opinion, in which
JUDGES GREGORY K. ORME and J. FREDERIC VOROS JR. concurred.

McHUGH, Judge:

¶1 Sam Ashworth appeals the trial court's declaratory judgment determining that Murph Bullock and his wife Cecelia Bullock (collectively, the Bullocks) are the owners of real property in Payson, Utah (the Property). We affirm.

BACKGROUND[1]

¶2     In 1976, Joseph Bates and Rosemary Bates Harris, brother and sister, held the Property as joint tenants, with right of survivorship. The Bullocks were living in a home located on the Property pursuant to a verbal rental agreement with Bates. The Bullocks had never met Harris and were unaware that she held an ownership interest in the Property.

¶3     On October 15, 1976, Bates executed a written document (the Writing), which states,

> I Joe Bates am selling my home.
> at 346 [West] 300 [South] Payson[, U]tah.
> To Murph and Cece Bullock
> For $84,000[.]00 to be paid $200.00
> a month until the year 2013.
> where for it will be *paid in full*.
> 10/15/1976 /s/ Joe Bates
> witness /s/ Woody Woodward

Bates read the Writing aloud to Murph Bullock, who is functionally illiterate, and then signed it. However, Harris never signed the Writing and neither the Bullocks nor Bates ever recorded the Writing or any other document indicating that the Bullocks claimed an interest in the Property. In May 1977, nearly seven months after Bates executed the Writing, Harris died.

¶4     The Bullocks still reside on the Property and have made the monthly payments specified in the Writing for over thirty years. The Bullocks have also contributed $800 each year to the property

---

1. "'On appeal from a bench trial, we view the evidence in a light most favorable to the trial court's findings, and therefore recite the facts consistent with that standard.'" *Alvey Dev. Corp. v. Mackelprang*, 2002 UT App 220, ¶ 2, 51 P.3d 45 (quoting *Johnson v. Higley*, 1999 UT App 278, ¶ 2, 989 P.2d 61).

taxes. However, title to the Property remained in Bates's name and the Bullocks have never claimed a tax deduction related to the Property. The Bullocks have maintained renter's insurance on the residence rather than an owner's insurance policy, but they have made significant repairs and improvements to the Property.

¶5     When Bates died in October 2010, Ashworth was appointed as the personal representative of the estate. Assuming that the Property was part of the estate, Ashworth instructed a property manager to contact the Bullocks for the purpose of obtaining a written rental agreement. The Bullocks refused to enter into a rental agreement, instead claiming that they were purchasing the Property from Bates.

¶6     On May 2, 2011, Ashworth filed a complaint against Murph Bullock for unlawful detainer. Bullock responded with an answer and a motion to dismiss the complaint. At a hearing on the motion to dismiss, the parties stipulated that the motion be denied and that the matter be set for a bench trial. At trial, Ashworth indicated that the estate no longer sought eviction under the unlawful detainer statute. Instead, the estate requested a declaratory judgment "regarding the rights of the parties with respect to the Property." The trial court ruled that Ashworth's motion was appropriate because the evidence at trial "focused on the issue of determining the nature of the agreement between Bates and the Bullocks." Accordingly, the trial court conformed the pleadings to the evidence and rendered a declaratory judgment on the effect of the Writing.

¶7     The trial court first ruled that "Harris' signature was unquestionably necessary on the [Writing] when it was executed in 1976." As a result, it determined that the Writing had not ripened into a contract at the time it was executed. However, the trial court also concluded that "upon Harris' death, the [Writing]

ripened into what can be argued is an enforceable contract."[2] Accordingly, the trial court ruled that the Bullocks had purchased the Property and that Ashworth was not entitled to relief under the unlawful detainer statute. Ashworth filed a timely appeal.

ISSUE AND STANDARD OF REVIEW

¶8    Ashworth argues that the Writing attempting to sell the Property to the Bullocks is void and unenforceable under the statute of frauds and therefore conveyed nothing to the Bullocks. "The applicability of the statute of frauds is a question of law to be reviewed for correctness." *Bennett v. Huish*, 2007 UT App 19, ¶ 25, 155 P.3d 917 (citation and internal quotation marks omitted).

ANALYSIS

¶9    Ashworth agrees with the trial court that the Writing was void and unenforceable under the statute of frauds when executed by Bates. However, he contends that the trial court erred in concluding that the Writing ripened into an enforceable contract upon Harris's death. In order to resolve this issue, we must consider the effect of the Writing and Harris's death on the ownership of the Property.

I. The Writing Was Not an Enforceable Contract when Executed by Bates.

¶10    The trial court correctly noted that "Utah courts have, over the years, consistently determined that the Statute of Frauds

---

2. The trial court's equivocation that the Writing is "arguably" a contract was due to an additional argument advanced by Ashworth that the Writing was too indefinite to create a contract. The trial court ultimately resolved that issue in favor of the Bullocks, and Ashworth has not appealed that determination.

requires the signature of both owners for the transfer of real property held in joint tenancy."[3] *See, e.g.*, *Krantz v. Holt*, 819 P.2d 352, 353 (Utah 1991) ("If [ex-husband] retained a joint interest in the property, his written consent to the property's sale would be necessary, not because of any clause in the agreement, but because the Utah statute of frauds so requires."); *Williams v. Singleton*, 723 P.2d 421, 423 (Utah 1986) (per curiam) ("One joint tenant or tenant in common cannot bind his cotenant by a contract which he may make relating to the common property."); *Centennial Inv. Co. v. Nuttall*, 2007 UT App 321, ¶ 10, 171 P.3d 458 ("[W]hen real property is held in joint tenancy, the signature of both owners is necessary to satisfy the Utah statute of frauds."). In this case, Harris did not execute the Writing and therefore, no enforceable contract was formed in 1976. *See Krantz*, 819 P.2d at 353; *Williams*, 723 P.2d at 423; *Centennial Inv.*, 2007 UT App 321, ¶ 10.

## II. The Writing Did Not Sever the Joint Tenancy.

¶11    The status of the joint tenancy at the time of Harris's death is relevant because it determines who became the owner of Harris's interest in the Property. If the joint tenancy remained in effect at that time, Harris's interest passed by law to Bates. *See generally Shiba v. Shiba*, 2008 UT 33, ¶ 17, 186 P.3d 329 (holding that both parties to a joint tenancy "hold a concurrent ownership in the same

---

3. Utah's statute of frauds provides,

> No estate or interest in real property, other than leases for a term not exceeding one year, nor any trust or power over or concerning real property or in any manner relating thereto, shall be created, granted, assigned, surrendered or declared otherwise than by act or operation of law, or by deed or conveyance in writing subscribed by the party creating, granting, assigning, surrendering or declaring the same, or by his lawful agent thereunto authorized by writing.

Utah Code Ann. § 25-5-1 (LexisNexis 2007).

property with a right of survivorship, i.e., each [tenant] is afforded the eventuality of a *full* ownership interest, conditioned upon the tenancy remaining unsevered, and one out-living the other" (citation and internal quotation marks omitted)); *see also In re Estate of Ashton*, 898 P.2d 824, 826 (Utah Ct. App. 1995) (reversing the district court's inclusion of property in the deceased's estate that, at the time of his death, was held in joint tenancy with full right of survivorship). If, on the other hand, Bates's attempt to convey the Property to the Bullocks severed the joint tenancy, he and Harris held the Property as tenants in common at the time of Harris's death. *See* Utah Code Ann. § 57-1-5(5)(a) (LexisNexis Supp. 2012) ("[I]f a joint tenant makes a bona fide conveyance of the joint tenant's interest in property held in joint tenancy to himself or herself or another, the joint tenancy is severed and converted into a tenancy in common."). When a tenant in common dies, that tenant's interest in the property passes to her heirs, rather than to the other tenants in common. *See Webster v. Lehmer*, 742 P.2d 1203, 1205 (Utah 1987) (explaining that the deed created a tenancy in common, not a joint tenancy, and that therefore, "when [the tenant in common] died intestate in 1975, her interest, instead of passing solely to [the other tenant in common], passed by the rules of intestate succession to [the deceased tenant's] two daughters"). Thus, if the Writing severed the joint tenancy, it was converted to a tenancy in common and Harris's interest passed to her heirs. *See Shiba*, 2008 UT 33, ¶ 17.

¶12    When a joint tenant conveys "his interest therein by a valid deed," he "'severs and terminates the joint tenancy by the creation of a tenancy in common.'" *Id.* (quoting *Tracy-Collins Trust Co. v. Goeltz*, 301 P.2d 1086, 1090 (Utah 1956)). However, such a conveyance by valid deed does not convey the entire property because a joint tenant may not "dispose of more than his own interest in joint tenancy property, i.e., one-half thereof." *Id.* (citation and internal quotation marks omitted); *see also Johnson v. Bell*, 666 P.2d 308, 312 (Utah 1983) ("A grantee under a quitclaim deed acquires only the interest of his grantor be that interest what it may." (citation and internal quotation marks omitted)); *Crowther v.*

*Mower*, 876 P.2d 876, 879–80 (Utah Ct. App. 1994) (holding that a quitclaim deed of the mother's one-half interest in property severed the joint tenancy and created a tenancy in common). Here, Bates never executed a deed in favor of the Bullocks. In addition, Ashworth concedes that Bates's intent was to contract for the sale of the entire Property, not just his half interest in it. *See In re Estate of Knickerbocker*, 912 P.2d 969, 975 (Utah 1996) ("[T]he key to determining whether a joint tenancy has been severed is the intent of the parties."); *Williams*, 723 P.2d at 425 (holding that one joint tenant could not alone accept an offer to purchase property where the "[buyers] offered to purchase the joint interest of the [sellers], and [one joint tenant] negotiated for the sale of the joint interest"); *Centennial Inv.*, 2007 UT App 321, ¶ 12 ("[B]oth parties agree that the negotiations were for the purchase of the joint interest of [the joint tenants].").

¶13    The Writing in this case indicates that Bates purported to contract to sell the entire property, stating, "I Joe Bates am selling my home." *See* Utah Code Ann. § 57-1-3 (LexisNexis 2010) ("A fee simple title is presumed to be intended to pass by a conveyance of real estate, unless it appears from the conveyance that a lesser estate was intended."); *Gold Mountain Dev., LLC v. Missouri Flat, Ltd.*, 2005 UT App 276U, para. 13 (mem.) (Orme, J., concurring in part, dissenting in part) (noting that the word "sell" is one that "typically indicate[s] a conveyance of title rather than the conveyance of a lesser estate"); *cf. Crowther*, 876 P.2d at 880 (holding that the quitclaim deed unambiguously evidenced the joint tenant's intent to convey her "one-half interest" and was therefore effective to sever the joint tenancy). Because Bates attempted to contract to sell the entire Property but could not validly agree to convey more than his own joint interest, the Writing did not ripen into a contract before Harris's death. *See Williams*, 723 P.2d at 425. As a result, it did not sever the joint tenancy and Harris's interest in the Property passed to Bates by operation of law when she died.

### III. The Writing Ripened into an Enforceable Contract.

¶14    Even though Ashworth is correct that the Writing did not comport with the requirements of the statute of frauds in 1976, we agree with the trial court's determination that it became an enforceable contract when Harris's interest passed to Bates. In reaching this conclusion, we find instructive the Utah Supreme Court's decision in *Williams v. Singleton*, 723 P.2d 421 (Utah 1986) (per curiam). There, the buyers made an offer to purchase real property held in joint tenancy by the sellers, a husband and wife. *Id.* at 422. By its terms, the offer expired if not accepted in one day. *Id*. The husband provided written authorization to the sellers' real estate agent to accept the offer on his behalf, but the wife did not execute the authorization. *Id.* at 423. After the real estate agent accepted the offer, the buyers decided not to purchase the property and the sellers refused to return their $5,000 earnest money. *Id.* The sellers sued, and the district court ruled in favor of the buyers, despite the wife's belated attempt to ratify the husband's actions in writing. *Id.* On appeal, the Utah Supreme Court held that no enforceable contract had been formed because the husband could not accept the buyers' offer without written authorization from the wife. *Id.* at 423–24; *see also id.* ("[A]n offer to purchase when accepted creates an interest in real estate and is within the statute of frauds." (citations omitted)).

¶15    Of significance to the issue before us, the *Williams* court also held that the wife's attempt to ratify the husband's acceptance in writing was "ineffectual *to revive the contract*" because it was made after the offer had expired according to the one-day deadline. *Id.* at 424 (emphasis added) (citing *Burg v. Betty Gay of Wash., Inc.*, 225 A.2d 85, 86 (Pa. 1966) (holding that ratification "must be in writing and executed prior to any effective renunciation by [the other party to the agreement]")); *see also Centennial Inv. Co. v. Nuttall*, 2007 UT App 321, ¶ 12, 171 P.3d 458 (holding that a Real Estate Purchase Contract (REPC) executed by only one joint tenant never ripened into a contract and therefore a subsequent REPC by which both joint tenants agreed to convey the property to a third party did not

breach the prior REPC). By implication, our supreme court's analysis indicates that had the wife ratified within the deadline for acceptance, the statute of frauds would have been satisfied and the contract, which was initially void and unenforceable, would have ripened into an enforceable contract.

¶16    In the present case, nothing occurred between Bates's execution of the Writing and his acquisition of fee title in the Property to prevent it from ripening into a contract. By the terms of the Writing and the parties' practices, Bates was not expected to convey title to the Property until 2013, when the Bullocks would have paid in full. Before he was required to transfer title, Harris's interest passed to Bates, thereby giving him sole ownership of the Property. Although the contract was unenforceable when originally signed, Bates's acquisition of full title "revived" it because Harris's signature was no longer necessary to satisfy the statute of frauds and the Writing had not been repudiated. *See Williams,* 723 P.2d at 424.

¶17    Accordingly, we reject Ashworth's argument that a contract void and unenforceable under the statute of frauds cannot become enforceable when the statutory defect is cured. Otherwise, subsequent ratification by the joint tenant who had not previously signed a real estate purchase contract would be irrelevant. *Cf. id.* (determining that because the offer had expired, the wife's attempt to ratify and accept it was ineffectual to create a contract). We also note that generally "a seller may make a valid contract to sell property, though the seller has no legal title to the property, as long as the seller has title when the time to convey arrives." *Utah Golf Ass'n, Inc. v. City of N. Salt Lake*, 2003 UT 38, ¶ 15, 79 P.3d 919; *see also Neves v. Wright*, 638 P.2d 1195, 1197 (Utah 1981) (reiterating the "fundamental rule that a seller need not have legal title during the entire executory period of a real estate contract"); *Corporation Nine v. Taylor*, 513 P.2d 417, 421 (Utah 1973) ("[T]he law does not require the vendor to have clear and marketable title at all times during the performance of his contract, and [he] is not ordinarily so obliged until the time comes for him to perform."). This rule is designed to

"enhance the alienability of real estate by providing necessary flexibility in real estate transactions." *Neves*, 638 P.2d at 1198. When applying it, courts should scrutinize the facts carefully and seek to "avoid unfairness, sharp practice, [or] outright dishonesty." *Id.* In this case, fairness dictates that the rule be applied.

¶18   Our supreme court has also instructed that the statute of frauds "should be used for the purpose of preventing fraud and not as a shield by which fraud can be perpetrated." *Jacobson v. Cox*, 202 P.2d 714, 720 (Utah 1949). Ashworth's position that Bates's estate is entitled to the Property despite Bates's written attempt to convey it to the Bullocks, the Bullocks' thirty-year performance of the terms of the Writing, and Bates's acquisition of the entire Property before his performance was due under the contract, would result in such a shield to Bates's estate and be contrary to the purposes of the statute of frauds.[4]

---

4. We note that some jurisdictions hold that this result is dictated by their after-acquired title statutes or common law concepts of after-acquired title. *See, e.g.*, *Hardigan v. Kimball*, 553 A.2d 1265, 1266–67 (Me. 1989) (holding that a land sale contract executed by one of two joint tenants was unenforceable when executed but became effective by virtue of Maine's doctrine of after-acquired title when the other joint tenant died and his interest passed to the joint tenant who had executed the contract); *Brousseau v. Brousseau*, 927 A.2d 773, 778 n.2 (Vt. 2007) (J. Dooley, dissenting) ("Regardless of whether [the other joint tenant's] interest passed to mother by right of survivorship or by will, mother subsequently obtained . . . the right to convey the property free of any claim by [the other joint tenant or that tenant's] estate. Mother's claim that [her grantee] now only holds a quarter interest in the property, therefore is defeated by the doctrine of after-acquired title."); *Simon v. Chartier*, 27 N.W.2d 752, 754 (Wis. 1947) (holding that, even if a contract for the sale of land was void due to one joint tenant's mental incompetence at the time it was executed, it became enforceable when that joint tenant died and his interest passed to the other joint

(continued...)

CONCLUSION

¶19    The Writing became an enforceable contract to sell the Property to the Bullocks. Although Bates, as a joint tenant, did not hold legal title at the time he executed the Writing, he held title in fee simple absolute once he survived the other joint tenant. At that point, the Writing had not expired or been repudiated, and Bates had not yet been required to convey title. Therefore, the Writing was no longer unenforceable under the statute of frauds.

¶20    Affirmed.

_____

4. (...continued)
tenant, whose mental capacity at the time of execution was not in dispute). Because we affirm on other grounds, we express no opinion on the impact of Utah's after-acquired title statute to the facts of this case. *See generally* Utah Code Ann. § 57-1-10 (LexisNexis 2010).