328 P.2d 726

H. L. ALLRED, Plaintiff and Respondent,

v.

Clifford C. HINKLEY, dba Union Seed Company of Burley, Idaho, Defendant and Appellant.

No. 8867.

Supreme Court of Utah.

July 15, 1958.

Herbert F. Smart, Salt Lake City, for appellant.

Ray E. Nash, Vernal, Edward W. Clyde, Salt Lake City, for respondent.

WADE, Justice.

Defendant, Clifford C. Hinkley, dba as Union Seed Company, hereinafter called the Company, appeals from a judgment in the district court of Duchesne County awarding $15,082.28 on claims of 26 seed growers for seed delivered to Wayne Malin, and through him to the Company at Burley, Idaho. The plaintiffs are seed growers near Roosevelt, Utah, who brought this suit on their own claims and similar claims of other growers as assignees. The Company paid the full purchase price or what it thought was the agreed purchase price of the seed in question to Malin, its special agent for the purchase of such seed, but Malin failed to pay part of the money received for each lot of seed to the growers. A judgment was also awarded against Malin for these and other claims, and Malin is now in bankruptcy.

There is practically no dispute in the evidentiary facts. Most of the testimony was given by Malin. There was also received in evidence answers to interrogatories submitted by plaintiff and extensive book records. Prior to 1950, when the Company made him its special agent to purchase seed for it, and thereafter through the year 1956 when his failure to account to seed growers for moneys paid to him by the Company for them, became known, Malin, operated a retail farmers' supply business with storage facilities. At first his business was known as the Roosevelt Flour Mill, but during the last few years he operated it under his own name. The company furnished Malin with a machine called a clipper for rough cleaning of seed. It obtained a license for him as its agent to purchase seed and supplied him with bags to be furnished to the growers in which to bag their seed. If the seed, which was placed in the Company's bags, was sold to the Company no charge was made for the bags, but if sold elsewhere a charge was made for these bags. The Company also furnished blank draft forms, forms for grading seed with Company Loading Sheet Forms for truck load shipments of seed to the Company, and various other record-keeping forms.

When seed was brought to Malin by a grower he tagged it with a lot number and stored it. He then sent a sample to the Company. Sometimes he would rough clean the sample in the clipper. From the sample the Company would grade the lot, testing it for germination and other qualities and usually would make an offer to purchase such lot of seed at a specified price per pound for cleaned seed. If the offer was accepted Malin would immediately send the seed to the Company in truck loads. There it was cleaned and weighed and the total purchase price determined. Sometimes Malin delivered a draft from the Company for an advance on the seed which was still growing in the fields, sometimes he drew for an advance on seed as it came into his warehouse, and other times he made further advances when the grade was communicated to him and the offer made. Sometimes a grower wished to wait for a higher price and the offer was not accepted until several months later. Other times the grower wishing to wait for a better price definitely instructed Malin to hold his seed and not sell it until so ordered. In other cases the evidence fails to show an acceptance of the Company's offer, but does not show that the grower specifically refused to accept such offer. If the offer was accepted by the grower immediately it would take from one to two weeks after the seed was delivered to Malin before the purchase price was determined. For the sample was first shipped, then the seed graded, the offer made, then the seed shipped to Burley where it was cleaned and the weight of the cleaned seed determined. In some instances the

grower waited for as long as four months before accepting the Company's offer. In cases where the grower refused to accept any offer of the Company the seed was delivered to Malin and it was in some cases several years before the grower learned that Malin had without the grower's consent sold the seed to the Company. In such cases Malin represented to the grower that the seed was being held either in his own or in the Company's warehouse.

Originally the Company made the advances and purchase price payments by honoring drafts made by Malin in favor of the grower. Since the local banks would not honor such drafts until accepted by the Company several days were required after the draft was issued before it was paid. In response to complaints by growers of this delay Malin began making payments by his own personal check and making the Company's drafts payable to himself. This the Company later authorized. All the growers whose claims are involved in this action knew of this change in the procedure, but there is no evidence that any of such growers asked for such change or complained about the delay.

This case presents two questions: (1) Is the Company liable for the money which Malin failed to remit to the grower, where the grower accepted the offer of the Company to purchase the seed? (2) Is the Company liable for the value of the seed over and above the payments and advancements made to the grower where Malin delivered such seed to the Company, falsely representing to it that the grower had accepted its offer to purchase?

We consider the second question first: The Company is clearly liable for the full value of the seed which Malin sold to it without authority to do so from the grower. For by taking possession of such seed upon delivery from Malin who had no right to make such sale or delivery the Company converted such seed to its own use. By such conversion the Company became liable to the grower for the full value of such seed less the amount which the grower received from it as advancements.

A conversion is an act of wilful interference with a chattel, done without lawful justification by which the person entitled thereto is deprived of its use and possession. The measure of damages of conversion is the full value of the property. It requires such a serious interference with the owner's right that the person interfering therewith may reasonably be required to buy the goods. Although conversion results only from intentional conduct it does not however require a conscious wrongdoing, but only an intent to exercise dominion or control over the goods inconsistent with the owner's right. A purchaser of stolen goods or an auctioneer who sells them in good faith becomes a converter since his acts are an interference with the control of the property or in other words, a claiming of

the ownership in such property and taking it out of the possession of someone else with intention of exercising dominion over it is a conversion. Thus a bona fide purchaser of goods for value from one who has no right to sell them becomes a converter when he takes possession of such goods.[1]

Applying the foregoing principles to the facts in this case it is clear that the Company by its purported purchase of such seed from Malin wilfully interfered with the grower's right to the possession and use of such seed without any lawful justification therefor. Such action amounts to a conversion, although the purported purchase was made in good faith and for valuable consideration because a conversion, as pointed out above, does not require an intentional wrongdoing, but only an intentional interference with the true owner's rights to such chattel. In such case the measure of damages is the full value of the seed converted after deducting the advancements previously made, if any, by the Company to the grower. So the judgment to this extent must be affirmed.

■■■■ The Company is likewise liable for the money which Malin failed to remit to the grower for seed sold to the Company.

The contention that an agent whose employment is restricted to purchases for cash supplied by the principal, absent the appearance of broader authority, has no authority to bind the principal's credit, though not disputed,[2] has no application to this case. There is no dispute on the extent of Malin's actual authority. He was not furnished with cash nor did his authority contemplate payment of cash for the seed upon delivery. He was authorized, after the seed was graded to offer a specified price per pound for clean seed. However, before the price of a lot of seed could be fixed, the seed had first to be delivered to the Company's trucks and then taken to Burley, Idaho, where it would be cleaned and weighed. The sale was consummated and the title passed in accordance with the intention of the parties as soon as the offer was accepted and the seed delivered by placing it on the trucks. There was a necessary lapse of time after such delivery and the payment, for the seed had to be shipped to Burley, there cleaned and weighed, and only then was Malin authorized to make the final payment on such lots.

The basis of the rule contended for by the Company is that where the agent has been supplied with cash on hand to pay for the goods which he is authorized to purchase, the seller has full opportunity to require the agent to pay for the goods simultaneously with the delivery and if

---

1. See Prosser's "The Law of Torts" Section 15 "Conversion."

2. See 2 Am.Jur. § 112, p. 93; Mechem on Agency, 2d Ed., Vol. 1, Sec. 914, p. 652; 2 C.J.S. Agency § 114, pp. 1312–1314.

payment is not then made the seller may withhold delivery of the goods. Under such circumstances there would never be any occasion for the extension of credit to the principal.

. Here no such condition existed for possession and title to the goods passed before the shipment to Burley. Thereafter, a few days elapsed before the purchase price was ascertainable and it took some time in addition to communicate the exact amount of the purchase price to Malin and for him to notify the grower thereof. Under the original system the grower would still have to wait a few days more until acceptance by the Company of the draft, which Malin would draw on it, in favor of the grower. Under the new system Malin could pay by delivering his personal check and then draw on the Company in his own name to repay him for such payment. This new system gave Malin the power to withhold payment of a part or all of the last payments from the grower, for under it the money was turned over to him to be paid to the grower. However, it was just as much an extension of credit to the Company under one system as the other. In both systems there was necessarily a period of time which elapsed between the sale and transfer of the seed to the Company and the time of the final payment therefor to the grower.

The new system was instituted because some growers complained of the delay in cashing their drafts on the Company. There is, however, no evidence that any of the growers whose claims are involved in this action asked for such change, but all of them knew of the new system. The Company also knew of and fully authorized this change. Whether or not these systems are considered an extension of credit to the Company there is no doubt that the Company with full knowledge thereof approved, adopted and operated under them. The Company knew of and had it within its power to refuse to operate under the new system by refusing to recognize Malin's payment by personal check to the grower. The only thing that Malin did which the Company did not fully authorize was his failure to pay the grower the final payment for the seed. The Company having adopted the system which made it possible for Malin to withhold payment of this money to the grower it is liable therefor. Where one of two innocent parties must suffer the loss should fall on the one who created the circumstances which made it possible for the wrong to be perpetrated.[3]

Judgment affirmed. Costs to respondent.

McDONOUGH, C. J., and CROCKETT, and WORTHEN, JJ., concur.

HENRIOD, J., does not participate herein.

3. See Harrison v. Auto Securities Co., 70 Utah 11, 257 P. 677, 57 A.L.R. 388.