Floyd E. BENTON and Professional United Development, a dissolved Utah corporation, Plaintiffs and Appellants,

v.

STATE of Utah, DIVISION OF STATE LANDS AND FORESTRY, DEPARTMENT OF NATURAL RESOURCES, William K. Dinehart, Director, and Donald B. Prince, Assistant Director, Defendants and Respondents,

v.

PORTLAND CEMENT COMPANY OF UTAH, a Utah corporation, Defendant in Intervention and Respondent.

PROFESSIONAL UNITED DEVELOPMENT, a dissolved Utah corporation, Plaintiff and Appellant,

v.

PORTLAND CEMENT COMPANY OF UTAH, a Utah corporation, Defendant and Respondent.

No. 18914.

Supreme Court of Utah.

Oct. 30, 1985.

Ronald C. Barker, Salt Lake City, for plaintiffs and appellants.

Michael M. Quealy, Dallin Jensen and Anne Stirba, Assistant Attys. Gen., Salt Lake City, for State.

Glen E. Fuller and Orval Harrison, Salt Lake City, for Portland Cement.

DURHAM, Justice:

Floyd E. Benton and Professional United Development ("the plaintiffs") appeal from a summary judgment in these consolidated actions. This appeal involves mineral leases issued by the State of Utah on a single tract of property: lots five and six of section eighteen, township one south, range two east, Salt Lake meridian (hereinafter "lots five and six"). In 1970, one lease was given to Professional United Development, in 1981, another was given to Floyd E. Benton, and in 1981, still another lease was given to Portland Cement Company of Utah ("Portland"). The plaintiffs sought recovery from Portland for limestone Portland removed during the term of the first lease, and a declaratory judgment that the 1981 lease to Benton includes limestone.

The plaintiffs raise three issues on appeal: first, whether the plaintiffs, as lessees of lots five and six, are entitled to damages from Portland for wrongful removal of limestone; second, whether the 1970 lease was extended at the end of its primary term; and third, whether the 1981 lease to Benton includes limestone.

The facts of this case are best understood by separately discussing each lease.

### The 1970 Lease to Plaintiff Professional United Development

The plaintiff Professional United Development ("United Development") obtained a mineral lease from the Utah Division of State Lands ("the State") on February 16, 1970. This mineral lease allegedly covered building stone and limestone and was for a "primary term of ten years ... and so long as said minerals may be produced in commercial quantities from said land." United Development did not conduct mining operations on the property during the primary term of the lease, but Portland extracted and removed substantial quantities of limestone from this property without the consent of United Development. Portland apparently did so pursuant to federal mining claims which were subsequently declared invalid in a federal court action. Both United Development and its president and director Benton sought to recover the value of the limestone removed by Portland, which United Development claims to be in excess of $6,000,000. The primary term of the lease expired December 31, 1980, and approximately 80% of the mineral remained in the ground at the end of that term.

United Development is now in the process of winding up its affairs.

### The 1981 Lease to Plaintiff Benton

In 1981, Benton filed a "Mineral Lease Application" for "building stone and limestone" on lots five and six. An employee of the State crossed off the word "limestone" on Benton's application without

Benton's knowledge or consent, and the lease was issued as only a building stone lease.

Benton asked the State to correct the lease to show that it included limestone, but the State refused to amend the lease. Benton eventually executed the unamended lease.

*The 1981 Lease to Portland*

After the events described above, the State offered a limestone lease on lots five and six by public bid. The plaintiffs sought and obtained a preliminary injunction to prevent the State from leasing lots five and six to third parties as a limestone lease. The preliminary injunction was dissolved, however, as a result of the summary judgment now before us. The State then leased the tract to Portland under a limestone lease. The plaintiffs assert that this lease to Portland violates their rights under the 1970 lease to United Development and the 1981 lease to Benton. They also argue that the lease to Portland violates the rules and regulations of the Utah Board of State Lands.

We address first the plaintiffs' claim that the district court erred in concluding that they do not have a cause of action against Portland for wrongful removal of limestone. The district court concluded:

Any claim against Portland Cement Company of Utah for removal of limestone from the leased premises is a claim by the Utah Division of State Lands and not a claim by Professional United Development because Professional United Development in no way was denied occupancy, use, or in any way interfered with by Portland Cement Company of Utah, and in fact Professional United Development never even attempted to go into possession of the leased premises during the term of said lease, and it is the State of Utah as owner of the fee estate that would have any claim in the event the mining claims of Portland Cement Company of Utah are invalid.

We agree with that conclusion and find that, contrary to the plaintiffs' assertions, there is no genuine issue as to any fact material to the district court's conclusion. The plaintiffs assert their claim in terms of trespass, trover, and conversion. Essential to that claim would be proof that United Development had possession of the limestone it argues was wrongfully removed. The record shows that United Development did not have such possession.

■ Because the plaintiffs seek damages against Portland equivalent to the full amount of the value they claim for the mined minerals—namely, $6,000,000—their claim is obviously not predicated on a trespass theory, but rather on a theory of trover or conversion. *See* W.P. Keeton, D. Dobbs, R. Keeton, D. Owens, *Prosser and Keeton on the Law of Torts* at 90 (5th ed.1984); *see also Allred v. Hinkley*, 8 Utah 2d 73, 76, 328 P.2d 726, 728 (1958) (conversion "requires such a serious interference with the owner's right that the person interfering therewith may reasonably be required to buy the goods"). We have said, "A conversion is an act of wilful interference with a chattel, done without lawful justification by which the person entitled thereto is deprived of its use and *possession.*" *Allred*, 8 Utah 2d at 76, 328 P.2d at 728 (emphasis added); *see also Frisco Joes, Inc. v. Peay*, Utah, 558 P.2d 1327, 1330 (1977).

■ "Utah follows orthodox criteria in applying the doctrine of conversion." *Richins v. Industrial Construction, Inc.*, 502 F.2d 1051 (10th Cir.1974). Essential to the doctrine of conversion is that the plaintiff have title or possession of the item allegedly converted.

"The general rule is that an action for conversion is not maintainable unless the plaintiff, at the time of the alleged conversion, is entitled to immediate possession of the property. An interest in the property which does not carry with it a right to possession is not sufficient; *the right to maintain the action may not be based upon a right to possession at a future time.*"

*Johnson v. Flowers*, 119 Utah 425, 428, 228 P.2d 406, 407 (1951) (emphasis added) (quot-

ing 53 Am.Jur. *Trover and Conversion* § 68, at 863–64 (1945)); *see also Larsen v. Knight,* 120 Utah 261, 280, 233 P.2d 365, 374 (1951).

■ The district court was correct in refusing to apply the doctrine of conversion to the present case because the 1970 lease between the State and United Development only gave United Development the right to possession of the stone at a future time— namely, at the time United Development severed the stone from the land. The lease agreement gave United Development

> the exclusive right and privilege to *mine, remove, and dispose* of all of the said Building Stone, in, upon or under the ... tract of land ... together with the right to use and occupy so much of the surface of said land as may be required for all purposes reasonably *incident to the mining, removal, and disposal* of Building Stone. ...

(Emphasis added.)

Equivalent lease provisions have been interpreted to

> not transfer the land, but [to give the lessees] an incorporeal hereditament, a right to quarry and take stone from the area involved. This stone [becomes] the property of [the lessees] only upon its actual severance. There can be no property in rock, and the title thereto cannot be divested or acquired until it has been taken from the earth.

*Jones Cut Stone Co. v. New York,* 7 Misc.2d 1048, 166 N.Y.S.2d 742, 746 (1957); *see also Lyons v. Central Coal & Coke Co.,* 239 Mo. 626, 647, 144 S.W. 503, 508–09 (1912); *Baker v. Hart,* 123 N.Y. 470, 472–73, 25 N.E. 948, 948–49 (1890).

In *Baker v. Hart,* the court construed a lease with language similar to the language in the lease between the State and United Development in this case. The *Baker* lease gave to the lessees

> the sole and exclusive right of entering in and upon the lands ... for the purpose of *quarrying, cutting, crushing, and removing stone* for the term of ten years, ... *but not to hold possession of any*

> part of said land for any other purposes.

*Baker,* 123 N.Y. at 472, 25 N.E. at 948 (emphasis added). The *Baker* court interpreted that provision as only giving the lessees possession of the stone they had quarried and removed within the terms of the lease, "but what they did not quarry out and sever from land remained the property of the owner of the fee." *Id.,* 123 N.Y. at 472, 25 N.E. at 948. We see no basis for reaching a different conclusion and hold that United Development did not have the possessory rights in the stone necessary to maintain a cause of action for conversion against Portland.

■ In addition to its conversion claim, United Development asserts that the district court erred by not responding to United Development's argument that U.C.A., 1953, § 40–1–12 (1981) gives it a statutory right to recover damages against Portland. We find no error in the district court's ignoring this statute in its findings of fact and conclusions of law. That statute does not delineate who has a cause of action for the wrongful taking of minerals, but rather sets forth the measure of damages to be used in such claims. Because we conclude that the plaintiffs do not have a cause of action for wrongful removal of limestone, section 40–1–12 is irrelevant.

We next consider the issue raised by the plaintiffs of whether the 1970 lease was extended at the end of the primary term. The habendum clause of the lease explains that the lease was for a ten-year primary term and "as long thereafter as said minerals *may be produced* in commercial quantities from said lands." (Emphasis added.) The plaintiffs further argue that Portland demonstrated that building stone could be produced in commercial quantities by its removal of limestone from the property; consequently, they claim the court erred in concluding that the 1970 lease expired on December 13, 1980, since it is clear that commercial quantities of building stone existed on the property.

■ We disagree, and we rule as a matter of law that the 1970 lease terminated

because United Development did not demonstrate that *it* could produce building stone in commercial quantities from lots five and six. Even assuming that the 1970 lease included limestone, United Development may not depend upon Portland to demonstrate that the stone exists in "commercial quantities." The lease agreement, read in its entirety, reflects the intention that *United Development* demonstrate the capability of producing the stone in commercial quantities, not a third party.

The stated purpose of the lease agreement is for the production of building stone. To accomplish this purpose, lots five and six were exclusively leased to United Development. It naturally follows that the intention of the parties was for the lessee to do something to bring about production. Further, the lease agreement prohibits United Development from subleasing or assigning the lease, thus evidencing an intention that the obligation to produce was United Development's alone and that the acts of third parties or strangers to the lease agreement would not suffice to meet this requirement of performance.

In addition, the lease agreement contains a requirement of diligent operation by United Development: "[It must] commence actual operations upon the land included hereon on or before March 1, 1972, and thereafter to diligently operate the property in accordance with the provisions contained in this lease." This provision, read in conjunction with the lease agreement's stated purpose and the exclusive rights given to United Development, further convinces us that the burden was on United Development to demonstrate its capability of producing stone in commercial quantities.

We do not disagree with the plaintiffs that the phrase "may be" as found in habendum clauses connotes the *possibility* of production in paying quantities. *See State ex rel. Commissioners of Land Office v. Carter Oil Co.*, Okla., 336 P.2d 1086 (1959). But, as analyzed above, this phrase in the context of the entire lease agreement does not mean that anyone may show this possibility. This lease agreement requires more

than just the discovery of the stone. It requires that the possibility of producing the stone lies within the power of the lessee, United Development. And as the uncontroverted facts show, United Development did not demonstrate any possibility that it could produce the stone in commercial quantities.

This would be a different case if Portland or the State had wrongfully interfered with United Development's lawful attempt to obtain production before the expiration of the lease term. But there is no genuine issue over whether the State as lessor in any way interfered with any of the rights of United Development as lessee. There is also no genuine issue over whether Portland in any way interfered with any operation or effort of United Development to mine and remove any material from the premises.

United Development suggests that a change in the lease form used by the Utah Division of State Lands between the 1970 lease form and the 1981 lease form somehow enhances United Development's position. We disagree. Notwithstanding any language in the 1981 lease form, the 1970 lease agreement between the State and United Development clearly requires the lessee to demonstrate the ability to produce stone in commercial quantities.

Having concluded that the 1970 lease has terminated, there is no need for us to rule on a subissue of whether that lease included limestone.

The last issue we address is raised by Benton, who claims that the 1981 lease to him includes limestone. He asserts that the lower court erred in concluding:

Mineral lease no. 39143 as held by Floyd E. Benton *covers "building stone" substance only,* and in light of the clear provisions of Rule 10 of the Regulations of the Board of State Lands governing the issuance of mineral leases, as amended effective January 1, 1979, and in force and effect on April 20, 1981, when mineral lease no. 39143 was issued to Mr. Benton, the substances included within said building stone lease *excluded lime-*

*stone*, and under said Rule 10 limestone must be subject to a separate mineral lease.

(Emphasis added.)

 We agree with the lower court. The State proceeded properly in submitting the limestone in lots five and six for bids under its rules and regulations.

The rules and regulations governing the issuance of mineral leases were amended as of January 1, 1979, to conform with U.C.A., 1953, §§ 65–1–18, –23, and –45 as then in force. These sections provide for separate mineral leases on state lands so as to allow for multiple use.[1] Under these amended rules and regulations, the Board of State Lands clearly segregated building stone from limestone:

RULE 10—CLASSIFICATION OF MINERALS FOR WHICH APPLICATION CAN BE MADE:

(a) Application can be made for, and the Board of State Lands *shall issue separate mineral leases* on, the following categories of mineral substances in the State-owned lands:

. . . .

8. Building Stone—Sandstone, Slate, Marble, Granite, Quartzite.

. . . .

12. Limestone.

Rule 10, Rules and Regulations of the Board of State Lands.

In addition, these rules and regulations specifically provide:

[T]he Division of State Lands shall issue leases only in the forms specified under Rule 10, and such leases shall be governed by these regulations and applicable provisions of State law.

Rule 22, Rules and Regulations of the Board of State Lands.

After the 1970 building stone lease expired, the State posted and offered lots five and six for lease on March 9, 1981, for *building stone*, stating that the existing building stone lease had been terminated. This was in accordance with Rule 7, which provides:

[I]n all cases where lands become available for leasing by the Division of State Lands because they are newly acquired, or because an *existing mineral lease is cancelled, relinquished, surrendered, or for any other reason. terminates,* the Division of State Lands shall offer the land for subsequent mineral leasing. . . .

Rule 7, Rules and Regulations of the Board of State Lands (emphasis added).

At that time, Mr. Benton, in his own name, made a new application dated March 13, 1981, for another ten-year lease on the same property for "building stone and lime-

---

1. U.C.A., 1953, § 65–1–18 (1978), which applies to mineral leases, specifies:

In furtherance of the principle of multiple use of state lands, the land board may grant a lease for the prospecting, exploration, development and production of *any mineral notwithstanding the issuance of other lease or leases on the same land for other minerals,* and shall include in such lease suitable stipulations for simultaneous operation. The board shall not issue more than one outstanding lease for the same purpose on the same land.

(Emphasis added.)

Following along the same trend, U.C.A., 1953, § 65–1–45 (1978) provides, in part:

In all cases where lands become available for leasing by the division because they are newly acquired, or because an existing mineral lease is canceled, relinquished, surrendered, or for any reason terminates, except where the division determines it is not in the best interest of the state to offer the land for lease, the divi-

sion shall offer the land for subsequent mineral leasing by the following procedure only:

(a) A notice of the lands having so become available for leasing shall be posted in the office of the division of state lands. The notice shall describe the land, *indicate what mineral interest in each tract is available for leasing,* and state the last date, which shall be fifteen days after the notice is posted, on which bids will be received.

(Emphasis added.)

U.C.A., 1953, § 65–1–23 (1978) specifies that the Board of State Lands shall adopt rules and regulations implementing the statutory provisions:

Except as otherwise provided by law, the state land board shall by rules and regulations prescribe the form of application, the form of lease, the annual rental, the amount of royalty and the basis upon which the royalty shall be computed, and such other details as it may deem necessary in the interest of the state.

stone." When the matter was brought before the Board of State Lands, a ten-year lease was granted to Floyd E. Benton for building stone only.

 The State then followed the statutory provisions and its rules and regulations in submitting the *limestone* lease for competitive bidding, and we agree with the trial court that the limestone lease to Portland was properly granted "in light of the clear provisions of Rule 10." Benton cannot successfully complain that the State refused to follow an improper and unauthorized procedure when he attempted to lease both building stone and limestone in the same lease agreement. He had a fair opportunity, after receiving his building stone lease, to bid for a limestone lease and, having failed to do so or having been unsuccessful, as the case may be, he is without grounds to complain.

■ In conjunction with this issue, Benton claims that under Rule 7(f) of the Rules and Regulations of the Board of State Lands, he has a preference right to lease limestone discovered on lots five and six. But Benton neglects to point out that Rule 7(f) contains specific time frames which must be complied with when an applicant seeks to lease a newly discovered mineral. The preference right only exists for sixty days after discovery, and the discoverer must notify the State within ten days after the discovery takes place. Neither Benton nor United Development has complied with these requirements.

■ Finally, the plaintiffs argue that the State's leasing program violates public policy because it grants rights to two separate lessees for the same substance as prohibited by U.C.A., 1953, § 65–1–18 (1978).[2] This argument fails because Benton does not have a lease to the limestone on the subject property, but only to building stone, which, under the rules and regulations, is a substance different from limestone. Neither plaintiff has produced any stone under either United Development's 1970 lease or Benton's 1981 lease, and we decline to spec-

ulate whether there will be a future conflict between the parties on this issue. Consequently, we do not reach the plaintiffs' public policy argument.

The plaintiffs raise a number of other contentions and subissues that are merely a recasting, in different terms, of the three issues we have treated here; therefore, we do not address them. Accordingly, we affirm the order of the district court granting the defendants' motion for summary judgment.

HALL, C.J., and STEWART, HOWE and ZIMMERMAN, JJ., concur.