2010 UT App 313

Cindy LAWRENCE, Wilma L. Schwenke, Tania P. Schwenke, and Wayne Wong, Plaintiff, Counterclaim Defendant, and Appellant,

v.

INTERMOUNTAIN, INC. dba Intermountain Isuzu; Isuzu LT, Isuzu Motors Acceptance Corporation; and Bank of America, N.A., Defendant, Counterclaimant, Third-party Plaintiff, and Appellee,

v.

Victor Lawrence; A. Paul Schwenke; and cSave.net, LLC, Third-party Defendant and Appellant.

No. 20080835–CA.

Court of Appeals of Utah.

Nov. 4, 2010.

510

Donald J. Winder and Lance F. Sorenson, Salt Lake City, for Appellants.

P. Bryan Fishburn, Salt Lake City, for Appellee.

Before Judges DAVIS, VOROS, and CHRISTIANSEN.

## OPINION

DAVIS, Presiding Judge:

¶ 1 Victor and Cindy Lawrence appeal the trial court's judgment in favor of Intermoun-

tain Isuzu (Intermountain). They primarily argue that the trial court erroneously determined that they are liable for (1) conspiracy to defraud, (2) conversion, and (3) punitive damages. We affirm.

## BACKGROUND[1]

¶ 2 In late 1999, A. Paul Schwenke, a business client of Mr. Lawrence, established cSave.net, LLC. Several months later, Schwenke decided to lease three vehicles for the personal use of his wife, his daughter, and the Lawrences. Mr. Lawrence helped Schwenke in this endeavor, contacting a car dealership in Bountiful to discuss leasing arrangements. But then Schwenke explored leasing possibilities with Intermountain, and the vehicles were ultimately leased from that dealership. Mr. Lawrence was present for some negotiations with Intermountain, and at one point he advised Schwenke to go to the Bountiful dealership if Intermountain would not meet the terms that the Bountiful dealership had offered. Mrs. Lawrence was also involved in the lease negotiations at some level, at least enough to know approximately how much the monthly lease payments on the vehicles would be.

¶ 3 Although Schwenke apparently first contacted Intermountain on behalf of cSave.net, cSave.net never had good credit or assets of any significance and the leases were ultimately not signed on behalf of cSave.net. Rather, Schwenke, his wife, his daughter, and Mrs. Lawrence offered $10,000 to Wayne Wong, who worked for cSave.net, to use his credit-worthiness and sign the leases. This arrangement was not, however, disclosed to Intermountain. With no intention of making the lease payments, Wong signed the contracts to lease three new Isuzu Rodeos on March 31, 2000. And to cover a cash down payment of $1,000 on each of the three leased vehicles, Mr. Lawrence wrote a personal check for $3,000, for which he was eventually reimbursed. At this point, the Lawrences took possession of one of the three leased vehicles—a black Isuzu Rodeo.

¶ 4 Shortly after the leases were signed, Intermountain sold the lease for the black Rodeo to Bank of America and the leases for the other two Rodeos to Isuzu Motors Acceptance Corporation/Isuzu LT (Isuzu). Soon thereafter, on May 25, 2000, Plaintiffs—Schwenke's wife, Schwenke's daughter, Wong, and Mrs. Lawrence—filed their complaint against Defendants—Intermountain, Bank of America, and Isuzu—asserting various causes of action, including breach of contract. Plaintiffs' complaint sought to enjoin Defendants from enforcing the three lease agreements, that is, from "declar[ing] the leases in default and repossess[ing] the vehicles."

¶ 5 After no payments were made on any of the three Rodeos for several months, and after Wong ignored several notices and demand letters, Intermountain was forced to repurchase the leases from Bank of America and Isuzu. After regaining ownership of the Rodeos, Intermountain attempted to repossess them. Intermountain tried to repossess the black Rodeo on January 31, 2001, while it was parked outside Mr. Lawrence's office. The owner of Intermountain, George Watkins, was present for the attempted repossession and showed Mr. Lawrence documentation evidencing Intermountain's right to the black Rodeo. But Mr. Lawrence refused to turn the black Rodeo over without a court order and then assaulted Watkins, putting him in a headlock and causing minor injuries. Immediately after the attempted repossession, Mr. Lawrence turned the black Rodeo over to Schwenke, knowing that the vehicle's lease was in default and knowing that Schwenke had no right to possess the vehicle. Schwenke then allowed a family member to drive the black Rodeo to California, where it was thereafter totaled in an accident.

---

1. We recite the facts as found by the trial court. Although several arguments in the Lawrences' brief seem to be indirectly attacking the trial court's findings, the Lawrences have not made any attempt to marshal the evidence as is required when challenging factual findings, *see Chen v. Stewart*, 2004 UT 82, ¶¶ 76–80, 100 P.3d 1177. Further, at oral argument, counsel for the Lawrences conceded that they are not challenging any of the trial court's factual findings. We therefore do not address any of the Lawrences' arguments that would require viewing the facts contrary to the trial court's extensive findings, which fill twenty-six pages.

¶ 6 In May 2001, Intermountain counterclaimed against Plaintiffs and initiated claims against Third-party Defendants—Schwenke, Mr. Lawrence, and cSave.net—pleading causes of action that included fraud, conspiracy to defraud, and conversion. Also in May 2001, Intermountain served interrogatories on Wong, the Schwenkes, and the Lawrences in an attempt to discover the location of the leased vehicles. Shortly thereafter, Mr. Lawrence entered an appearance as counsel, representing himself, his wife, Wong, and the Schwenkes. Mr. Lawrence then purposefully delayed the proceedings by attempting to remove the case to federal court despite the fact that removal would have been improper.[2] Thus, Intermountain did not obtain a Writ and Order of Replevin on the black Rodeo until October 5, 2001. And it was not until the trial court entered a contempt order and Plaintiffs were faced with jail time that they finally answered the interrogatories intended to reveal the location of the vehicle. The completely totaled black Rodeo was eventually returned to Intermountain in 2002.[3]

¶ 7 Each of Plaintiffs' causes of action was eventually dismissed on motions for summary judgment, and the trial court characterized the lawsuit as "designed to impede Intermountain's efforts to recover the vehicle[s]." The trial court also determined that Mr. Lawrence had filed a similar lawsuit on behalf of himself, his wife, and the Schwenkes regarding a similar leasing deal with another automobile dealership, West Valley Dodge. In that case, (1) another entity owned by Schwenke arranged the leasing of three vehicles; (2) one of those vehicles was given to the Lawrences to use; (3) payments were not made on the leased vehicles; (4) shortly after the vehicles were leased, Mr. Lawrence filed a lawsuit against the dealership in an attempt to assert rights to continued possession of the vehicles; and (5) the vehicles were ultimately repossessed—less than one month before the Lawrences and the Schwenkes leased the vehicles at issue here from Intermountain.

¶ 8 A bench trial on Intermountain's claims was held in June 2007. The trial court held Wong liable for fraud and held the Lawrences liable for conspiracy to defraud and conversion. The three were held jointly and severally liable for $138,267.25, which included prejudgment interest. The trial court also determined that punitive damages were warranted against Wong and the Lawrences, and another bench trial was held in March 2008 to determine the amount of punitive damages. The resulting awards of punitive damages were $138,267.25 against Wong, $484,000.00 against Mr. Lawrence, and $99,999.99 against Mrs. Lawrence. The Lawrences now appeal.

## ISSUES AND STANDARDS OF REVIEW

¶ 9 The Lawrences initially argue that the trial court erred, as a matter of law, in determining that they were liable for conspiracy to commit fraud. We review this question of law for correctness, granting the trial court no deference. *See State v. Pena,* 869 P.2d 932, 936 (Utah 1994).

¶ 10 Second, the Lawrences argue that the trial court erred in holding them liable for conversion because Intermountain did not have rights to the vehicle prior to January 31, 2001, and they "relinquished possession" on that date. Whether the facts establish the elements of conversion is a question of law, *see Nielsen v. Spencer,* 2008 UT App 375, ¶ 12, 196 P.3d 616 (treating as questions of law arguments "ask[ing] us to interpret and apply the elements of [a tort]"), which we review for correctness, *see Pena,* 869 P.2d at 936.

¶ 11 Third, the Lawrences argue that the punitive damages awards against them are excessive under both state law and the federal constitution. In *Crookston v. Fire Insurance Exchange,* 817 P.2d 789, 808 (Utah 1991), the Utah Supreme Court "enunciated seven factors to be analyzed in evaluating whether a punitive damage award is excessive" under state law. *Smith v. Fair-*

2. In addition to the removal being denied, a judgment of $1,500 for attorney fees was entered as a sanction against Plaintiffs, Mr. Lawrence, and cSave.net.

3. Intermountain was ultimately able to obtain possession of the other two Rodeos as well. However, both had sustained "substantial damage" by the time they were repossessed.

fax Realty, Inc., 2003 UT 41, ¶ 32, 82 P.3d 1064. And the Utah Supreme Court "has adopted a de novo standard for reviewing jury and trial court conclusions under the *Crookston* factors." *Id.* ¶ 31; *see also Diversified Holdings, LC v. Turner,* 2002 UT 129, ¶ 5, 63 P.3d 686. Likewise, " 'the question whether a [punitive damages award] is constitutionally excessive calls for the application of a constitutional standard to the facts of a particular case, and in this context de novo review of that question is appropriate.' " *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.,* 532 U.S. 424, 435, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001) (emphasis omitted).

## ANALYSIS

### I. The Legal Requirements of Conspiracy to Defraud

¶ 12 The trial court determined that the Lawrences had participated in a conspiracy to defraud Intermountain of the use of the three Rodeos, and the trial court held the Lawrences liable for the damages flowing from the fraudulent scheme. "To prove a civil conspiracy, plaintiff must show the following elements: (1) a combination of two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result thereof." *Israel Pagan Estate v. Cannon,* 746 P.2d 785, 790 (Utah Ct.App.1987). The Lawrences argue that the facts here did not support the trial court's determination that they met each element of conspiracy to defraud, specifically, that there was a meeting of the minds regarding the fraud committed by Wong.[4] We agree with the trial court that sufficient facts showed the Lawrences' "knowing and intentional participation in the fraud."

¶ 13 As to Mrs. Lawrence, the trial court relied on the facts that (1) she had very recently had a vehicle repossessed that had been leased by Schwenke from West Valley Dodge under a similar arrangement; (2) she had participated in the $10,000 inducement to Wong;[5] (3) she was present for the signing of the leases and was aware of their financial terms; (4) she took possession of the black Rodeo with no intention to pay the lease and made no attempt to ensure lease payments would be made; and (5) she was a plaintiff in a lawsuit designed to impede Intermountain's recovery of the leased Rodeos. As to Mr. Lawrence, the trial court relied on the facts that (1) he had very recently had a vehicle repossessed that had been leased by Schwenke from West Valley Dodge under a similar arrangement; (2) he helped Schwenke find new vehicles to lease; (3) he was present at the lease signing and was

---

4. The Lawrences argue in their brief that because the trial court found that neither of them directly made any affirmative misrepresentations to Intermountain, "the trial court was precluded from finding the Lawrences were liable for conspiracy to commit fraud." Although the Lawrences are correct that "conspiracy to defraud requires proof of the underlying fraud," *Gildea v. Guardian Title Co. of Utah,* 970 P.2d 1265, 1271 (Utah 1998), it is not necessary that the underlying fraud have been actually committed by each member of the conspiracy. The Lawrences misconstrue the rule that "[a] conspiracy to defraud is fraud committed by two or more persons who share an intent to defraud another," *see DeBry v. Cascade Enters.,* 879 P.2d 1353, 1359 (Utah 1994), to mean that each person in the conspiracy must actually commit the fraudulent action. Such is simply not the case. Instead, conspiracy to defraud may exist where fraud was committed by one actor, but other persons shared the *intent* to defraud. Indeed, we have previously held that a necessary condition to hold someone liable for fraud is that the person "made the false representations himself, authorized someone to make them for him, *or* participated in the misrepresentation in some way, such as through a conspiracy." *Israel Pagan Estate v. Cannon,* 746 P.2d 785, 792 (Utah Ct.App.1987) (emphasis added). Moreover, we understood responses by the Lawrences' counsel at oral argument as acknowledging that a fraud committed by Wong could have been the underlying fraud sufficient to support a conspiracy charge.

5. The Lawrences contest the trial court's reliance on a judicial admission made by Mrs. Lawrence in her complaint that "in order to induce plaintiff Wayne Wong to sign on the leases, plaintiffs agreed to pay him $10,000.00." But "[a]n admission of fact in a pleading is a judicial admission and is normally conclusive on the party making it." *Baldwin v. Vantage Corp.,* 676 P.2d 413, 415 (Utah 1984). And we see no reason for the trial court to depart from this general rule where the trial court was not persuaded by Mrs. Lawrence's assertions that she had never read the complaint or authorized it to be filed on her behalf.

aware of the leases' financial terms; (4) he provided the down payment for the leased vehicles; (5) he took possession of the black Rodeo with no intention of making lease payments and without putting forth any effort to ensure payments would be made; and (6) he likely knew of the $10,000 inducement given to Wong.[6] We are convinced that these facts demonstrate that the Lawrences intentionally participated in the fraud on Intermountain, that is, they committed acts in furtherance of the fraud. We therefore affirm the trial court's civil conspiracy determination.

¶ 14 The Lawrences also argue that the above activities cannot be used to show their participation in the fraud because none of these actions are themselves illegal. But such is not a requirement of conspiracy. Rather, conspiracy simply requires one illegal action—in this case, fraud. And certainly we need not consider each of the Lawrences' activities separately because facts that seem benign when viewed individually may establish the occurrence of fraud when considered as a whole, see id. at 793 n. 9 (" 'Facts of trifling importance when considered separately, or slight circumstances trivial and inconclusive in themselves, may afford clear evidence of fraud when considered in connection with each other. It has been said that in most cases fraud can be made out only by a concatenation of circumstances, many of which in themselves amount to very little, but in connection with others make a strong case.' "). Thus, this argument is not well taken.

## II. Conversion

 ¶ 15 " 'A conversion is an act of wilful interference with a chattel, done without lawful justification by which the person entitled thereto is deprived of its use and possession.' " *Fibro Trust, Inc. v. Brahman Fin., Inc.*, 1999 UT 13, ¶ 20, 974 P.2d 288 (quoting *Allred v. Hinkley*, 8 Utah 2d 73, 328 P.2d 726, 728 (1958)). The trial court held the Lawrences liable for conversion of the black Rodeo from April 1, 2000, to January 31, 2001—the months during which they had actual possession of the vehicle—and measured damages by the fair rental value of the vehicle for those months. The Lawrences argue that the trial court erred in its conversion determination because Bank of America, and not Intermountain, had title to the vehicle during those months. This argument is unavailing, however, because when Intermountain repurchased the vehicle from Bank of America, Bank of America assigned "all of its right, title and interest" in the vehicle to Intermountain. These rights included Bank of America's right to pursue a cause of action for conversion for the months that the Lawrences had possession of the vehicle. We therefore see no error in this conversion determination.

 ¶ 16 The trial court additionally held Mr. Lawrence liable for conversion of the black Rodeo for the time period after Intermountain demanded the vehicle and Mr. Lawrence refused, giving the vehicle instead to Schwenke, thereby "knowingly and intentionally act[ing] to frustrate Intermountain's attempt to recover the vehicle." The trial court measured damages for this by calculating Intermountain's cost to recover the vehicle, minus the money it received from selling the vehicle. The Lawrences challenge this determination, essentially arguing that Intermountain's right to the vehicle was "conditioned by self help without breach of the peace." Although the Lawrences point to statutory authority that provides that a party

---

**6.** Notwithstanding their concession that they are not challenging the trial court's findings, the Lawrences purport to attack the trial court's finding that "Mr. Lawrence was fully aware of, and intentionally participated in, the scheme to obtain and use vehicles without the intent to pay for their use." They imply that this finding is entirely based on the trial court's subsidiary finding that because the Lawrences were married when Mrs. Lawrence participated in the inducement to Wong, it was "reasonable to infer" that Mr. Lawrence was also aware of that inducement. However, this finding regarding knowl-edge of the inducement is only one of six facts the trial court lists as supporting its finding that Mr. Lawrence knowingly and intentionally participated in the conspiracy to defraud. Furthermore, a court may look to the relationship of the parties and use reasonable inferences in determining whether a conspiracy existed. *See Israel Pagan*, 746 P.2d at 791 ("[C]onspiracy may be inferred from circumstantial evidence, including the nature of the act done, the relations of the parties, and the interests of the alleged conspirators."). This argument is therefore unavailing.

may repossess collateral without judicial process if doing so does not result in a breach of the peace, *see* Utah Code Ann. § 70A–9a–609(2) (2009), the statute does not state that the *right* to possession is affected by a breach of the peace. A person causing a breach of the peace when faced with repossession does not somehow convert his wrongful possession into lawful possession. Likewise, the fact that the issue is being litigated does not mean that the party attempting repossession does not have the right to immediate possession, even if he cannot legally enforce that right by means of self-help. Indeed, accepting the Lawrences' argument on this issue would reward a party in wrongful possession of property for his noncompliance with repossession attempts and would encourage baseless litigation.[7]

¶ 17 And we see no error in the trial court's determination that Mr. Lawrence's actions from January 31, 2001, forward amounted to willful interference with Intermountain's possession, done without lawful justification. First, knowing that Intermountain had the right to repossess the vehicle, Mr. Lawrence attacked and assaulted Watkins when repossession was attempted. And then Mr. Lawrence gave the vehicle to Schwenke as soon as he knew Intermountain was attempting to repossess it, notwithstanding his knowledge that Schwenke had no right to use or possess the vehicle. Further, as the trial court found, Mr. Lawrence "used his knowledge of the court system to purposefully forestall Intermountain's effort to recover its vehicles." The simple fact that Mr. Lawrence no longer had physical possession of the vehicle does not mean that he was unable to have willfully interfered with the

vehicle, thereby depriving Intermountain of its rightful possession. Thus, we see no error in the trial court's conversion determination.

## III. Punitive Damages

### A. State Law

¶ 18 The Lawrences argue that the punitive damages awarded by the trial court are excessive under State law, that is, under the Utah Supreme Court's decision in *Crookston v. Fire Insurance Exchange*, 817 P.2d 789 (Utah 1991).[8] The *Crookston* court set forth seven factors that must be considered when evaluating the amount of punitive damages awarded:

(i) the relative wealth of the defendant; (ii) the nature of the alleged misconduct; (iii) the facts and circumstances surrounding such conduct; (iv) the effect thereof on the lives of the plaintiff and others; (v) the probability of future recurrence of the misconduct; (vi) the relationship of the parties; and (vii) the amount of actual damages awarded.

*Id.* at 808.

¶ 19 In their evaluation of the *Crookston* factors, the Lawrences focus almost exclusively on those few facts that militate against an award of punitive damages.[9] We agree with the Lawrences that some of the *Crookston* factors weigh against punitive damages awards in this case, specifically the fourth factor regarding the effect on the victim and the sixth factor regarding the relationship of the parties. Although forcing Intermountain to, in the trial court's words, "absorb a significant financial hit," the Lawrences' wrongdoing did not affect a large number of vic-

---

7. Although it is clear from the conspiracy findings that the trial court did not believe the Lawrences' assertions that they thought cSave.net was paying for the lease on the vehicle, any such assertions would be irrelevant to the conversion claim. "Although conversion results only from intentional conduct it does not however require a conscious wrongdoing, but only an intent to exercise dominion or control over the goods inconsistent with the owner's right." *Allred v. Hinkley*, 8 Utah 2d 73, 328 P.2d 726, 728 (1958). That is, a conversion requires "only an intentional interference with the true owner's rights." *Id.*

8. The Lawrences make several arguments regarding the punitive damages awards that are based on their assertion that they were not liable for the fraud perpetrated against Intermountain. We need not address these arguments because we have already determined that the Lawrences were indeed liable under a civil conspiracy theory for the damages arising from fraud relating to the three leased vehicles, *see supra* Part I.

9. The Lawrences also largely focus on the version of the facts that they argued at trial, which facts are contrary to the facts as found by the trial court. Again, as we explained above, *see supra* note 1, we do not address such arguments.

tims or impair Intermountain's ability to continue its business. *See generally Diversified Holdings, LC v. Turner*, 2002 UT 129, ¶ 20, 63 P.3d 686 (considering, under the fourth *Crookston* factor, whether the defendant's conduct had a "widespread effect on groups of vulnerable victims or a devastating impact on the plaintiff" and stating that " [t]he larger the number of people affected, the greater the justification for higher punitive damages' "). Also, there is no special relationship between the Lawrences and Intermountain, nor is Intermountain a particularly vulnerable victim. *See generally id.* ¶ 23 ("The greater the trust reposed in a defendant, the greater will be the justification for a more significant award of punitive damages. The breach of a fiduciary relationship also justifies higher punitive damages." (citation omitted)). Nonetheless, the remainder of the *Crookston* factors weigh heavily in favor of punitive damages.

¶ 20 As to the first *Crookston* factor, that is, the defendant's relative wealth, the trial court had a difficult time arriving at an exact number for the Lawrences' wealth. The trial court found that Mrs. Lawrence is "secretive and evasive" concerning her assets and that Mr. Lawrence "has tried hard over the past several years to disguise and hide the amount and sources of his income." However, even from the limited evidence available, the trial court was able to make some findings regarding income. The trial court relied on Mrs. Lawrence's status as a member and manager of two income-receiving companies to reject her claim that she was penniless. As to Mr. Lawrence, the trial court rejected his "protestations of poverty" and was able to determine that "he has since at least the early 2000s received substantial income, far and above what would be considered average annual income," [10] and that he owns software that "has generated huge if unspecified royalty income." Although relative wealth is a factor to be considered, we recognize that "the introduction of evidence as to the relative wealth of the defendant is not a technical prerequisite to

an award of punitive damages." *Bennett v. Huish*, 2007 UT App 19, ¶ 38, 155 P.3d 917. Furthermore, the Lawrences may not simply remain secretive regarding their incomes and assets in an attempt to thwart the assessment of a punitive damages award: " '[T]he defendant who appears to have wealth but in fact does not, should not expect the plaintiff to point this out to [the trier of fact] for him. He himself must present to [the trier of fact] evidence of his inability to pay a large award of punitive damages.' " *Id.* (alterations in original) (quoting *Hall v. Wal–Mart Stores, Inc.*, 959 P.2d 109, 113 (Utah 1998)).

¶ 21 Regarding the second *Crookston* factor—the nature of the misconduct—the punitive damages awards here were supported by liability for both conversion and conspiracy to defraud, each being misconduct for which punitive damages may be appropriate. *See generally* Utah Code Ann. § 78B–8–201 (2008) ("Except as otherwise provided by statute, punitive damages may be awarded only if compensatory or general damages are awarded and it is established by clear and convincing evidence that the acts or omissions of the tortfeasor are the result of willful and malicious or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others."). "Deliberate false statements, acts of affirmative misconduct, [and] concealment of evidence of improper motive support more substantial awards, as do acts involving trickery and deceit." *Smith v. Fairfax Realty, Inc.*, 2003 UT 41, ¶ 35, 82 P.3d 1064 (alteration in original) (citation and internal quotation marks omitted). Here, both Mrs. and Mr. Lawrence took actions involving trickery and deceit in relationship to the fraudulent scheme. Further, "[b]ehaviors that undermine the efficiency and integrity of the judicial process may also be considered under the rubric of the second *Crookston* [ ] factor." *Diversified Holdings*, 2002 UT 129, ¶ 17, 63 P.3d 686. Mrs. Lawrence participated to some extent in such behavior when, as the trial court found, she "ignored the [trial]

---

10. The trial court subsidiarily found that Mr. Lawrence's income approached $40,000 a month in mid–2004 and that since at least 2005 he has consistently received payments of $35,000 a month in consulting fees.

court's Orders compelling discovery until [she was] found in contempt, and looking at jail time." In addition to ignoring court orders, Mr. Lawrence, the trial court found, "used his knowledge as an attorney and of the Rules of Civil Procedure in furtherance of the conspiracy to defraud Intermountain, and to stonewall Intermountain's effort to locate and retrieve [the missing vehicles]," including "after entry of the Orders that directed that the vehicles be surrendered to Intermountain."

¶ 22 The third *Crookston* factor "looks to the circumstances surrounding the illegal conduct, particularly with respect to what the defendant knew and what was motivating his or her actions." *Smith*, 2003 UT 41, ¶ 38, 82 P.3d 1064 (internal quotation marks omitted). The trial court found that Mrs. Lawrence was a willing participant in the conspiracy to defraud, participated in the offer to Wong, was fully aware of the scheme to defraud, and "consented to benefit from the use of [the] vehicle[ ] under terms that she had no intention of honoring." She did this in order to have possession of a vehicle "which she, her husband, and family could drive for free." Mr. Lawrence also willingly participated in the conspiracy, notwithstanding that his income was such that it "comfortably enabled him to purchase or lease a vehicle without resort to fraud and deceit." And the Lawrences' knowledge of and intentional participation in the scheme is more evident when considering that they had previously participated with the Schwenkes in a similar scheme involving West Valley Dodge. The trial court found that Mr. Lawrence also "knew he had no lawful right to possess or use" the black Rodeo. Nonetheless, he wanted "to acquire free use of" it. Indeed, he desired to extend that free use as long as possible, and when Intermountain first attempted to repossess the black Rodeo, "he, without cause or justification, attacked and assaulted Intermountain's owner, . . . causing minor physical injury." And then he immediately turned possession of the black Rodeo over to Schwenke, knowing that Schwenke had no right to possess and use it.

¶ 23 The fifth *Crookston* factor addresses the probability that the misconduct will occur again in the future. " 'A high probability of recidivism justifies a higher than normal punitive damage award.' " *Id.* ¶ 42. The prior incident with West Valley Dodge is pertinent here because the two patterns of events have striking similarities. *See id.* (citing case law stating that "courts should look to the existence and frequency of similar past conduct" in evaluating this factor (internal quotation marks omitted)). Further, the Lawrences do not take any responsibility for their illegal actions. *See generally Campbell v. State Farm Mut. Auto. Ins. Co.*, 2004 UT 34, ¶ 33, 98 P.3d 409 ("[The defendant's] obdurate insistence that its treatment of [the plaintiffs] was proper clearly calls out for vigorous deterrence."). As the trial court found, "[Mrs.] Lawrence . . . exhibits no regret or remorse for her conduct or the economic losses she caused Intermountain. She does not acknowledge that she did anything wrong or improper. Any wrongdoing, according to [Mrs.] Lawrence, is someone else's fault." And the trial court found that Mr. Lawrence "has exhibited no regret or remorse for his conduct in this case. He is wholly unrepentant. He denies that he has done anything wrong or improper." Indeed, even on appeal, the Lawrences persist in arguing that they did not do anything that was very bad, notwithstanding the contrary findings by the trial court, which findings they have conceded they are not challenging. And the trial court found that the Lawrences are likely to participate in another similar fraudulent scheme in the future, finding that Mrs. Lawrence's "purposeful effort to cloak herself in total ignorance, combined with her lack of honesty and candor," evidences that she would engage in similar wrongdoing in the future, and that "[o]nly by making the cost of the game potentially too expensive to comfortably bear, is Mr. Lawrence likely to be deterred from engaging in similar future conduct." Therefore, this factor weighs heavily in favor of punitive damages because the very purpose of punitive damages is to deter further wrongdoing, *see State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) ("Compensatory damages are intended to redress the concrete loss that the plaintiff has suffered by

reason of the defendant's wrongful conduct. By contrast, punitive damages serve a broader function; they are aimed at deterrence and retribution." (citation and internal quotation marks omitted)); *Crookston v. Fire Ins. Exch.*, 817 P.2d 789, 811 (Utah 1991) (stating that the purpose of punitive damages is furthered " 'by punishing and deterring outrageous and malicious conduct [or conduct which manifests a knowing or reckless indifference toward, and disregard of, the rights of others] which is not likely to be deterred by other means' " (alteration in original)).

¶ 24 Finally, the seventh *Crookston* factor compares the amount of actual damages awarded with the amount of punitive damages awarded. "The ratio of punitive to compensatory damages does not, by itself, determine whether or not an award is excessive; an award that falls outside certain parameters will, however, elicit more searching judicial scrutiny." *Diversified Holdings, LC v. Turner*, 2002 UT 129, ¶ 24, 63 P.3d 686. Here, the trial court held the Lawrences jointly and severally liable for compensatory damages in the amount of $138,267.25. The punitive damages award against Mrs. Lawrence was $99,999.99, for a ratio of punitive to compensatory damages of 0.7 to 1. The award against Mr. Lawrence was $484,000.00, for a ratio of 3.5 to 1.[11] "For

punitive awards of less than $100,000 a ratio of three to one will generally be justifiable, but for awards greater than $100,000, a somewhat lower ratio is usually appropriate." *Id.* As to Mrs. Lawrence, the award is presumptively not excessive, *see id.*; *Bennett v. Huish*, 2007 UT App 19, ¶ 38, 155 P.3d 917 ("The general rule is that where the punitive damages award is under $100,000, and is less than three times the amount of actual damages, it is presumed that the award is not excessive . . . ."), and we think that such an amount—which is actually less than the amount of compensatory damages—is not excessive considering Mrs. Lawrence's knowledge of the fraud and her apparent need for additional deterrence. As to Mr. Lawrence, the size of the award requires greater scrutiny on our part. "For awards of greater than $100,000 we have indicated some inclination to overturn awards having ratios of less than 3 to 1, but that inclination may be overcome by appropriate facts." *Diversified Holdings*, 2002 UT 129, ¶ 24 n. 11, 63 P.3d 686 (internal quotation marks omitted). Although the ratio here is slightly *greater* than 3 to 1, we are convinced that the punitive damages award is not excessive under the facts of this case, particularly given Mr. Lawrence's significant wealth, his persistent attempts to impede

---

11. The compensatory damages figure used by the trial court included $57,854.38 in prejudgment interest. The Lawrences argue that this figure should not be included in forming ratios under the *Crookston* analysis, arguing that prejudgment interest, like an award of attorney fees, is not properly considered. *See generally Campbell v. State Farm Mut. Auto. Ins. Co.*, 2004 UT 34, ¶ 47, 98 P.3d 409 (concluding that costs and attorney fees awards are not to be included in the denominator when comparing compensatory and punitive damages). But we are persuaded by Intermountain's argument that prejudgment interest is of a different character than an attorney fees award because it represents damages suffered by the plaintiff for which he or she is to be compensated. *See Trail Mountain Coal Co. v. Utah Div. of State Lands & Forestry*, 921 P.2d 1365, 1370 (Utah 1996) ("[A]n award of prejudgment interest simply serves to compensate a party for the depreciating value of the amount owed over time . . . ." (alteration in original)); *Kraatz v. Heritage Imps.*, 2003 UT App 201, ¶ 75, 71 P.3d 188 ("The purpose of awarding prejudgment interest is to compensate for the full loss suffered by the plaintiff in losing the use of the money over time."). And we are not persuaded by the Law-

rences' argument that including prejudgment interest in the denominator would result in different denominators based on whether the case was a jury trial or a bench trial. Even if prejudgment interest was calculated after a jury award was fashioned, the prejudgment interest amount would still be available for the trial court's later evaluation as to whether the punitive damages award was excessive. And as to the Lawrences' argument that "[t]he appropriate ratio of punitive damages should not be affected by the time elapsed between the filing of a complaint and the trial of the action," we are unsympathetic to such an argument where it is the Lawrences that are largely responsible for the lengthy period of time that has elapsed prior to the conclusion of this case.

Furthermore, even were we to take the prejudgment interest amount out of the denominator, it would not alter the ratio to the point where we would determine the award to be excessive—increasing the number representing punitive damages from 0.7 to 1.2 in the award against Mrs. Lawrence and from 3.5 to 6 in the award against Mr. Lawrence. We think the facts support awards of these proportions as well.

legal proceedings, and his complete refusal to acknowledge the illegal nature of his actions. We therefore determine that the punitive damages awards were not excessive and affirm the awards.

## B. Federal Constitutional Law

¶ 25 The Lawrences also argue that the amount of punitive damages awarded by the trial court violates their federal constitutional rights to due process. "The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm*, 538 U.S. at 416, 123 S.Ct. 1513. The United States Supreme Court has established three guideposts for evaluating punitive damages awards: "the degree of reprehensibility of the [misconduct]; the disparity between the harm or potential harm suffered by [the victim] and [the] punitive damages award; and the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *BMW of N. Am. v. Gore*, 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). However, the Lawrences address only the first guidepost in their due process argument. Thus, the issue is inadequately briefed and we decline to address it further. *See Valcarce v. Fitzgerald*, 961 P.2d 305, 313 (Utah 1998) (stating that appellate courts will generally not address arguments that are inadequately briefed).[12]

## CONCLUSION

¶ 26 The trial court did not err in determining that the facts satisfy the requirements of conspiracy to defraud and conversion. Additionally, the punitive damages awards are not excessive, and we affirm the same.

¶ 27 WE CONCUR: J. FREDERIC VOROS JR. and MICHELE M. CHRISTIANSEN, Judges.

---

12. We do, however, recognize that our decision would likely remain unchanged even were we to analyze the punitive damages awards under the federal guideposts, seeing that there is considerable overlap between the federal guideposts and the *Crookston* factors. The second, third, and fifth *Crookston* factors, which we determined to weigh in favor of large punitive damages awards here, are subsumed within the federal "reprehensibility" guidepost. *See Smith v. Fairfax Realty, Inc.*, 2003 UT 41, ¶ 35 n. 14, 82 P.3d 1064. And the second guidepost compares the ratio of punitive damages to compensatory damages, just as does the seventh *Crookston* factor. Moreover, in addressing that ratio, the Supreme Court, like our state cases, declined to establish a ceiling for punitive damages awards but instead stated, "Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003); *see also id.* (citing to cases where a 4 to 1 ratio of punitive to compensatory damages was acceptable). Thus, the ratios here are not so high as to obviously violate the Lawrences' due process rights under a federal analysis.